**B & D APPRAISALS, Plaintiff,**

v.

**GAUDETTE MACHINERY MOVERS, INC. and Tri–State Motor Transit Co., Defendants.**

**Civ. A. No. 88–0581 L.**

United States District Court, D. Rhode Island.

March 28, 1990.

Mark A. Pogue, Providence, R.I., for plaintiff.

Robert G. Parks, Wellesley Hills, Mass., for Gaudette Machinery Movers, Inc.

Richard D. Boriskin and Thomas Bender, Providence, R.I., for Tri–State Motor Transit Co.

## MEMORANDUM AND ORDER

LAGUEUX, District Judge.

This matter is before the Court on the motion of defendant, Tri–State Motor Transit Co. (Tri–State), to alter or amend the judgment entered for plaintiff, B & D Appraisals (B & D), pursuant to Federal Rule of Civil Procedure 59(e). The jury returned a verdict for B & D in the amount of $45,360.00 for damage done to its goods being transported by Tri–State.[1] Tri–State now argues in support of the motion that the jury verdict represents an excessive award under the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. §§ 10103, 11707 and 10730 (1989), which limits a common carrier's liability for damage to transported goods to the actual loss suffered. Tri–State argues that in light of evidence that B & D planned to sell the transported goods immediately upon delivery, at a price which could be readily calculated, this Court should amend the judgment by reducing the jury award to $31,-474.00 and recalculating interest on that amount. Plaintiff defends the jury finding by arguing that B & D was not contractually bound to sell the goods at a set price at delivery and that, therefore, the jury award was within the range allowed by law—the measure of damages being the fair market value of the goods before the incident less any amounts received for salvage thereafter.

---

**1.** The total judgment was $52,681.86 since $7,321.86 of interest was added to the verdict by the Court.

## Background

From the evidence elicited at trial, it appears that B & D, a Rhode Island partnership (Henry Barney and Patrick Doran being the partners), operates a business which buys, sells, and brokers jewelry machinery. In June of 1988, Leach & Garner of North Attleboro, Massachusetts (a jewelry manufacturer) contacted Doran requesting that B & D purchase a gold mixing machine, called an Inresa, at an auction to be held in St. Petersburg, Florida. Leach & Garner promised that if B & D purchased the machine and successfully delivered it in good condition to Leach & Garner in North Attleboro, Leach & Garner would pay B & D an amount equal to the purchase price paid at auction (not to exceed $60,000.00), plus a 10% commission, plus all expenses of custody and delivery.

Doran testified that B & D purchased the Inresa machine and necessary accessories at the auction for $41,250.00. B & D paid the auctioneers from its own funds and hired a guard, at a cost of $2,500.00, to protect the machine until B & D could arrange for shipping. B & D contracted with Gaudette Machinery Movers, Inc. (Gaudette) to ship and deliver the Inresa machine to Leach & Garner in North Attleboro for $2,200.00. Gaudette, unknown to B & D, hired Tri–State to transport the machine. On route, the Inresa machine fell from Tri–State's truck in Connecticut causing substantial damage. Leach & Garner refused to purchase the machine when it arrived in North Attleboro in its damaged condition. Thereafter, while B & D attempted to find a new buyer, it paid $360.00 to have the Inresa removed from Leach & Garner's property, $1,000.00 to have the machine placed in storage, and $39.00 in advertising costs. After a period of time, B & D sold the machine in its damaged condition for $20,000.00.

After the close of all evidence, the Court granted plaintiff's motion for a directed

verdict as to both defendants on the issue of liability and stated that only the issue of damages would be submitted to the jury. The Court further indicated that in closing arguments the attorneys were free to argue their own interpretations of the evidence relating to damages. B & D argued that it should receive the difference in market value of the Inresa machine before and after the event causing the damage. It relied on its expert witness, Peter DiChristifano, who had opined that the Inresa machine had a fair market value, in June of 1988, in or around North Attleboro, of $65,000.00. B & D argued that, after deducting the salvage value received by B & D from $65,000.00 and considering the additional expenses incurred by B & D, a total award of approximately $48,000.00 would be reasonable. Tri–State argued that B & D should recover approximately $31,000.00, the amount that it would have been paid by Leach & Garner minus the net salvage value.

The Court instructed the jury that the liability imposed on any carrier should represent the actual loss suffered by the shipper. The Court further stated that the before and after market value test merely represents one convenient means of determining the loss suffered and that said measure of damages could be discarded when another, more accurate method presented itself. The Court stressed to the jury that the amount awarded must fully and fairly compensate the plaintiff for the amount lost as a result of damage to its machine and specified that the damages should place the plaintiff in the same position as it would have been in had the equipment been delivered to its destination undamaged.

After deliberations, the jury returned a verdict of $45,360.00. Tri–State, in its motion to alter or amend the judgment, now contends that the jury's verdict is excessive as a matter of law.[2] Tri–State argues that since B & D acted merely as a broker,

---

**2.** Tri–State properly filed this motion, questioning the correctness of a substantive, legal decision which affected the outcome of the trial, under Federal Rule of Civil Procedure 59(e). *Appeal of Sun Pipe Line Co.,* 831 F.2d 22, 24 (1st Cir.1987), *cert. denied,* 486 U.S. 1055, 108 S.Ct.

2821, 100 L.Ed.2d 922 (1988). Had Tri–State argued that, as a matter of fact, the jury returned an excessive verdict, the proper procedure would have been to move for a remittitur or a new trial. *See* Fed.R.Civ.P. 59(a).

intending to transfer the Inresa to Leach & Garner upon delivery, the jury's verdict unjustly enriches B & D because the award fails to limit B & D's damages to the price Leach & Garner had agreed to pay.

B & D argues that it is entitled to the full fair market value of the Inresa before the damage less its salvage value after the damage because B & D owned the Inresa machine outright and could have sold the machine to any customers after delivery. Plaintiff contends that although Leach & Garner promised to buy the Inresa from B & D if B & D purchased the machine at the auction, B & D was never contractually bound to sell the Inresa to Leach & Garner.

After hearing oral arguments on this issue, the Court took the matter under advisement. It is now in order for decision.

### Discussion

█ The courts which have discussed damages under the Carmack Amendment have sought, on a case by case basis, to determine the amount of actual injury suffered by a plaintiff shipper. The difference between the fair market value (measured at the point of destination) of the goods transported by a carrier before and after the damage occurred represents the generally accepted measure of damages. *Polaroid Corp. v. Schuster's Express, Inc.,* 484 F.2d 349, 351 (1st Cir.1973); *F.J. McCarty Co. v. Southern Pac. Co.,* 428 F.2d 690, 692 (9th Cir.1970). However, courts have abandoned this measure when another approach has more accurately reflected the plaintiff's actual loss. *Illinois Cent. R.R. Co. v. Crail,* 281 U.S. 57, 64, 50 S.Ct. 180, 181, 74 L.Ed. 699 (1930); *F.J. McCarty Co., supra,* 428 F.2d at 692.

The Carmack Amendment refers to actual loss. *See* 49 U.S.C. § 11707(a)(1) (1989). The First Circuit has interpreted actual loss to mean what the plaintiff would have received had the carrier delivered the goods undamaged. *See Polaroid Corp., supra,* 484 F.2d at 351–52. The Court rejects plaintiff's contention that courts only stray from the market value measure when evidence of fair market value does not exist. The Court also rejects plaintiff's assertion that the intended use of the goods by the

owner is irrelevant. To the contrary, it is clear that a court should examine meticulously what the owner of the goods intends to do with the goods upon delivery. *See Illinois Cent. R.R. Co., supra,* 281 U.S. at 63–65, 50 S.Ct. at 181–82 (consignee of coal only allowed wholesale value of coal lost in transit because of ability to replace coal without loss of retail sales); *United States v. Palmer & Parker Co.,* 61 F.2d 455, 459 (1st Cir.1932) (court rejected market value of mahogany logs as measure of damages because owner used logs to manufacture furniture; loss, if any, diminished price of furniture). Courts have used contract prices as the measure of market value when, prior to the shipment of the goods, the shipper had executed a binding contract to sell the goods upon delivery. *See John Morrell & Co. v. Burlington Northern, Inc.,* 560 F.2d 277, 279–80 (7th Cir.1977); *United States v. Northern Pac. Ry. Co.,* 116 F.Supp. 277, 278–79 (D.Minn.1953). The question then becomes what measure of damages will indemnify the plaintiff? *Weirton Steel Co. v. Isbrandtsen–Moller Co.,* 126 F.2d 593, 594 (2d Cir.1942).

What represents the most accurate measure of B & D's damages in this case depends on whether or not it was bound contractually to sell the Inresa machine to Leach & Garner. B & D argues now, as it argued to the jury in summation, that it entered into a unilateral contract and that, as a promisee, it was not bound to sell the machine to Leach & Garner. The Court agrees with B & D on this point and, therefore, concludes that the jury was not required to restrict the award of damages to the difference between the amount B & D would have received had it sold the Inresa to Leach & Garner and the salvage value.

█ Bilateral and unilateral contracts create distinguishable rights, duties, and obligations. A bilateral contract involves mutual promises which simultaneously obligate the parties. A unilateral contract arises when a party makes a promise in exchange for another's act or performance. *See Judd Realty, Inc. v. Tedesco,* 400 A.2d 952, 956 (R.I.1979); *see also Greene v. Oliver Realty, Inc.,* 363 Pa.Super. 534, 526

A.2d 1192, 1194 (1987). Since the act or performance sought constitutes the bargained for detriment (consideration), a return promise has no effect on the bargain. Only the fulfillment of the performance will create a contract and establish the rights and duties of the parties. *See* Calamari & Perillo, *The Law of Contracts* §§ 2–28, 4–15 (2d ed. 1977) [hereinafter Calamari]. Unlike in a bilateral contract where both parties concurrently bind each other to the agreement by their mutual promises, "the crux of [a unilateral contract] is the open discretion in the optionee to take or to leave the proposal." *Hood v. Hawkins*, 478 A.2d 181, 185 (R.I.1984). In a unilateral contract, no mutuality of obligation exists—only the promisor becomes bound when the promisee executes the bargained for act. *See id.; see also* Calamari, *supra*, at § 2–14. "[T]he legal result is that [the promisor] is the only party who is under an enforceable legal duty. The other party to this contract is the one to whom the promise is made, and he is the only one in whom the contract creates an enforceable legal right." 1 *Corbin on Contracts* § 21 (1963).

Although seemingly one-sided, the offeror always controls the offer. As the master of the agreement, the offeror could bind the offeree immediately by requiring acceptance, not through performance, but by return promise. *Id.* at § 35. Further,

> [h]olding that the offered promise has become binding and irrevocable involves no injustice to the promisor. Although bound by contract, his duty to render the performance that he has promised is conditional on completion of the consideration as he requested in his offer.... 'There can be no actionable duty on the part of the offeror until he has received all that he demanded, or until the condition is excused by his own prevention of performance by refusing tender.' *Id.* at § 63.

In the present case, Leach & Garner promised that it would pay a calculable amount if B & D purchased, delivered, and transferred title to an Inresa machine to Leach & Garner. Leach & Garner's duty to pay depended on B & D's successful performance. As in a situation where an individual, A, promises to pay B $100 if B walks across a bridge, B & D was to accept Leach & Garner's offer only through its performance. B & D did not make any binding commitment or promises to Leach & Garner. *See* Calamari, *supra,* at §§ 2–14, 4–15. Had the Inresa arrived in North Attleboro undamaged, B & D would have had the option of tendering title to the Inresa to Leach & Garner or of selling the machine to another customer.

Since B & D was not bound to sell the Inresa to Leach & Garner, the jury was free to consider any evidence relating to the Inresa machine's value prior to the incident. The parties presented the jury three alternative values to consider in calculating what damages B & D suffered. First, plaintiff offered competent evidence, through its expert, to establish a fair market value at destination of $65,000.00. If the jury accepted that figure and subtracted the net salvage value of $18,601.00 (derived from the $20,000.00 salvage price minus the expenses of $1,000.00, $360.00 and $39.00 incurred in the salvage sale), it would have rendered an award of $46,399.00. Second, in light of the evidence that Leach & Garner was willing to pay up to $60,000.00 for the Inresa, the jury could have accepted that amount as the true value of the Inresa. Subtracting the net salvage value of $18,601.00 from $60,000.00 would have produced an award of $41,399.00. Finally, the jury was free to accept Tri–State's approach and limit the value of the Inresa to the amount to be paid to B & D by Leach & Garner if it had been delivered intact. That would have included the $41,250.00 purchase price paid at auction, plus a commission of $4,125.00, plus $2,500.00 as custodial costs, plus $2,200.00 in transportation charges for a total of $50,075.00. Subtracting the net salvage value of $18,601.00 would have produced the $31,474.00 amount argued for by Tri–State.

The jury obviously discounted the expert witness's testimony to some extent. It is reasonable to conclude that the jury found the fair market value of the Inresa before

it was damaged to be about $63,960.00 and after subtracting the net salvage value the verdict of $45,360.00 was produced. This constitutes a reasonable and rational result. There was no error of law inhering in the verdict and, of course, the Court will not interfere with the jury's fact finding function in this case.

### Conclusion

For the reasons stated above, the motion of defendant Tri–State to alter or amend the judgment hereby is denied.

*It is so Ordered.*