Derek A. ARDITO, et al.,

v.

CITY OF PROVIDENCE, et al.

C.A. No. 03–155T.

United States District Court, D. Rhode Island.

May 27, 2003.

Marc Gursky, Gursky Law Associates, Providence, RI, for plaintiffs.

Joseph M. Fernandez, Bruce Todesco, Sara Rapport, City of Providence law Dept., Providence, RI, for defendants.

### MEMORANDUM AND ORDER

TORRES, Chief Judge.

#### Introduction

The plaintiffs are fourteen individuals who have applied for positions as Providence police officers and were selected to attend the 61st Providence Police Academy, successful completion of which is a prerequisite to being hired. The plaintiffs brought this action to enjoin city officials from, now, excluding them from the Academy and replacing them with other applicants chosen on the basis of changed selection criteria.

The matter is before the Court for consideration of the plaintiffs' application for a preliminary injunction pursuant to Fed. R.Civ.P. 65(a). For the reasons hereinafter stated, the plaintiffs' application is granted and the defendants will be preliminarily enjoined from conducting the 61st Providence Police Academy unless the plaintiffs are included.

#### Facts

After observing the witnesses who testified during a four-day hearing and reviewing the exhibits, this Court finds the relevant facts to be as follows.

Sometime in 2001, the City of Providence (all defendants collectively referred to as "the City") decided to begin hiring officers to fill existing vacancies in its Police Department ("the Department") and additional vacancies that the City expected would result from anticipated retirements. Only individuals who graduate from a training academy conducted by the City are eligible to become Providence police officers. Accordingly, the City decided to conduct two consecutive training academies, the 60th and 61st Police Academies.

The size of each Academy is based on the number of vacancies that the City expects will need to be filled. The size of previous Academies has ranged from as few as four applicants to as many as fifty-eight. Originally, the 60th and 61st Academies were each to consist of fifty applicants; but, because Academy personnel complained that a school of fifty was too large, the number to be admitted to the 61st Academy was reduced to forty.

In order to be admitted to the Academy, an applicant must pass a series of tests and be deemed qualified by members of the Department who interview the applicant. Applicants are provided with a booklet describing the selection process and they complete an application form in which they acknowledge that although they may successfully complete all phases of the evaluation process and may be deemed qualified, they are not guaranteed acceptance into the Academy.

The selection criteria have varied slightly from academy to academy; but, generally, the process includes a physical agility test, a written examination, a background check and one or more interviews. The applicants deemed the most qualified, then, are tentatively selected to fill available slots in the Academy. At that point, a letter is sent informing those applicants that they have been selected to attend the Academy provided that they successfully complete a medical examination and psychological examination. Applicants who pass both examinations, then, are admitted into the Academy.

Members of each Academy class are ranked based upon their performance; and, upon graduation, they are hired, in the order of their ranking, to fill available vacancies in the Department. If there are more graduates than job openings, the City may either hire all of the graduates

and temporarily lay off those not needed or the City may hire only those needed and put the others on a waiting list.

Before becoming permanent members of the Department, Academy graduates must serve a one-year probationary period during which they may be terminated even without cause. The collective bargaining agreement between the City and the police officer's union provides that once the probationary period is completed, a police officer can be terminated only for cause. The collective bargaining agreement also provides for job assignments, post assignments, vacation choices, layoffs, shift assignments, and the like to be made on the basis of seniority. In addition, seniority plays a role in promotions. Seniority among members of the same academy class is determined on the basis of rank within the class.

At the time the decision was made to conduct the 60th and 61st Academies, the police chief was Colonel Richard Sullivan. Colonel Sullivan asked Major Dennis W. Simoneau to chair a Majors' Board that would interview applicants as part of the selection process. Major Simoneau was chosen, at least in part, because evidence presented during a trial in which members of a previous administration were prosecuted for corruption (the "Plunderdome" trial) indicated that, when applicants were being selected for an earlier academy, Major Simoneau had opposed efforts to admit an applicant that Major Simoneau felt was unqualified and from whom it later was discovered a bribe had been solicited.

Major Simoneau agreed to chair the Majors' Board provided that "ground rules" were established for selecting applicants. Colonel Sullivan agreed and the procedure that was adopted consisted of the following steps.

Applicants first had to pass a physical agility test and a written examination. Although the written examination was scored, an applicant's score played no role in ranking that applicant for admission into the Academy because some community groups had expressed concern that the test was not fair to minority applicants. Accordingly, 70 was selected as a passing grade and applicants who attained a grade of 70 or more remained eligible for consideration.

The 391 applicants who passed both the physical agility test and the written examination, then, were interviewed by a Patrolmen's Board that usually consisted of four patrolmen and a lieutenant. The members of that Board had a list of five questions and lists of the points that they felt should be included in a satisfactory answer to each question. The same five questions were asked of each applicant and each Board member graded an applicant based upon the applicant's answers to the questions and the applicant's answers to follow-up questions asked by the Board. In addition, Board members had discretion to award "bonus points" for specified factors such as ability to speak more than one language. An applicant's score on the Patrolmen's Board was the total of the points received from each Board member.

Lieutenant Kenneth M. Cohen, the head of the Human Resources Department, then ranked the applicants according to their scores on the Patrolmen's Board and scheduled those with the highest scores for interviews by the Majors' Board chaired by Major Simoneau. The applicants were not scheduled in any particular order and the majors did not know where an applicant ranked.

Before the Majors' Board interviews were conducted, background checks were performed. The officer assigned to perform a background check submitted a brief report that included the officer's recom-

mendation as to whether the applicant should be considered for the Academy. The reports were reviewed by Lt. Cohen who was supposed to schedule Majors' Board interviews only for those applicants receiving favorable recommendations.

All of the plaintiffs in this case, except Jerome Musco, received favorable recommendations; but, due to an oversight, Lt. Cohen scheduled Musco for a Majors' Board interview. The report on Musco did not contain anything negative about his character. It simply stated, "I do not feel that I can fully recommend Jerome to continue as a potential candidate" because "one of the character references he used did not even know him." The report concluded by saying, "Jerome fulfills the required age of 21, but I do believe it may be best for Mr. Musco to grow and mature a bit more and possibly reconsider a career in Law Enforcement at a later time." The reference alluded to was Major Simoneau, who Musco listed because he was an uncle of Musco's girlfriend at the time.

The Majors' Board consisted of Major Simoneau and Major Guido Laorenza. On a few occasions when Major Laorenza was unavailable, Captain Thomas Oates took his place. According to the procedure established by Colonel Sullivan, the Majors' Board was to go as far down the Patrolmen's Board rankings as was necessary to select the number of applicants required to fill the class. Although there were only fifty slots in the 60th Academy, the 125 applicants with the highest scores on the Patrolmen's Board were interviewed so that comparisons could be made. The seventy-five applicants not selected plus the twenty-five applicants with the next highest scores, later, were interviewed by the Majors' Board for the 61st Academy. Thus, for each Academy, the Majors' Board interviewed a number of applicants that was approximately double the number

of spaces in the class and the Board selected what it considered to be the best of those applicants.

Prior to interviewing a candidate, Major Simoneau reviewed that applicant's file including the results of the background check. During the Majors' Board interview, Major Simoneau asked questions based, primarily, on information contained in the applicant's file, and Major Laorenza questioned the applicant about more general matters. The applicant also was asked to give a brief presentation on why he/she should be accepted into the Academy. At the conclusion of the interviews, all applicants were told that if they "passed" the Majors' Board, they would be offered a place in the Academy provided that they successfully completed a medical examination and a psychological examination.

Majors Simoneau and Laorenza felt that maturity was an important consideration in selecting for the 60th Academy because graduates of the 61st Academy would look to graduates of the 60th Academy for guidance on the job. Accordingly, age and work experience were two of the factors that they considered. Among the other factors that they considered were fluency in a foreign language, membership in a minority group, military background, police background, experience in a serviced-based occupation and college education. Each of them graded applicants, essentially, on a scale of 1–5 with 1 signifying most qualified and 5 signifying least qualified. Applicants rated 5 by either major were eliminated from consideration for that Academy. Applicants rated 1 or 2 by both majors were placed on the list of individuals who would be invited to attend the Academy subject to passing the medical and psychological examinations. The remaining slots in the Academy were filled after the majors discussed the applicants

and reached agreement on who should be selected. The list of applicants selected for the 60th Academy by the Majors' Board was provided to Colonel Sullivan, who directed that conditional letters of acceptance be sent to them.

The seventy-five, or so, applicants not selected for the 60th Academy, were "recycled" and considered for admission into the 61st Academy along with the twenty-five applicants having the next highest scores on the Patrolmen's Board. Once again, those applicants were scheduled, in no particular order, for Majors' Board interviews. When those interviews had been completed, Major Simoneau presented a list of the forty applicants who had been selected to Major Laorenza, who had succeeded Colonel Sullivan as Chief.

Chief Laorenza instructed Lt. Cohen to draft and send letters to the applicants on that list. Letters also were sent to two or three individuals who were unable to complete the 60th Academy because of injuries and had been promised consideration for the 61st Academy. Forty-two or forty-three letters were sent in the expectation that a few of the applicants interviewed would fail either the medical or psychological examination; and that, therefore, no more than forty would qualify. Because of the expense involved, the medical and psychological examinations generally were the last steps in the selection process and were administered only to the number of applicants needed to fill the available slots in the Academy.

Most of the letters were sent on October 15, 2002.[1] The first two paragraphs informed the recipient that he/she had placed high enough on the oral evaluation "to make you eligible to be accepted into the 61st Training Academy Class of this department depending upon your successfully passing the next two phases of the process" which were identified as "the psychological examinations and the medical examinations."[2] Those paragraphs further stated that the letter was "a conditional offer of employment" but reiterated that "selection as a participant in the Academy Class" was dependent upon "successful completion of the two remaining phases of the evaluation process."

The third paragraph of the October 15 letter stated that, "there are more candidates then [sic] positions in the 61st Recruit Class" and that "[t]herefore an actual offer of employment will not be made until all of the results are known". That language was inserted only because Lt. Cohen believed that no final decision had yet been made as to whether the size of the class would be as many as forty or as few as thirty. That belief appears to have been erroneous because Major Simoneau testified that Colonel Sullivan previously had fixed the class size at forty. In any event, there was no question in anyone's mind that, if the class size was fixed at forty all of the recipients of the October 15 letter who passed the medical and psychological examinations would be admitted to the Academy.

All of the plaintiffs received the October 15 letter and all of them passed the medical and psychological examinations which were both lengthy and intrusive.[3] Most of the plaintiffs notified their employers that

---

1. Plaintiff Annis received the letter on September 23, 2002.

2. A sample of the October 15 letter is attached to this Memorandum & Order.

3. Plaintiff Forlini had already taken and passed the psychological examination in connection with his application to the Warwick Police Department, so he was able to satisfy that portion of the requirements by signing a release authorizing Providence to obtain a copy of the results.

they expected to be leaving their jobs soon and some withdrew their names from consideration for other jobs.

A couple of months after the October 15 letter was sent, Colonel Dean Esserman was hired to replace Colonel Laorenza as Police Chief. Because of rumors of favoritism and revelations regarding past irregularities in the selection of Providence police officers that surfaced during the "Plunderdome" trial, Chief Esserman ordered a review of the procedure employed in selecting applicants for the 61st Academy. He instructed Lt. Cohen to review the background checks that had been performed on applicants who had received the October 15 letter and he appointed a committee to report to him about the selection process. Lt. Cohen informed Chief Esserman that the officers performing the background checks had made favorable recommendations with respect to all of the applicants receiving the October 15 letter except plaintiff Musco. Nevertheless, after hearing the committee's report about how applicants were chosen, Chief Esserman did not feel "comfortable" with the selection process because he concluded that the scoring system used by the Majors' Board was too subjective and, therefore, was not a "best practice". Chief Esserman has made it clear that his concern was based solely on the process, itself, and not on any belief that the process was tainted by any impropriety or that the applicants selected are, in any way, unqualified. Indeed, the City has indicated that the plaintiffs might very well be accepted into a future academy.

Because of his dissatisfaction with the selection process, Chief Esserman directed Lt. Cohen to write to all applicants who passed the physical agility and written tests informing them that the process was being reviewed and asking them to notify the Department if they were still interested in admission to the Academy. That letter was sent on February 13, 2003, and all of the plaintiffs responded by reiterating their interest.

Eventually, Chief Esserman decided to revise the selection process by combining the scores received by each applicant on the written examination and the Patrolmen's Board and inviting the forty applicants with the highest combined scores to attend the 61st Academy, which he scheduled for April 28, 2003. Although Musco was among those with the forty highest scores, he was not invited, presumably because he had not been recommended by the officer performing his background check. None of the other plaintiffs had scores placing them in the top forty.

When the plaintiffs learned, through the "grapevine", that they were not going to be included in the Academy class, they brought this action seeking, among other things, to enjoin the City from conducting the Academy unless they were allowed to participate. Their complaint includes claims for breach of contract and violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.;* and a § 1983 claim for deprivation of property without due process.

### *Preliminary Injunction Standard*

■ A party seeking a preliminary injunction must demonstrate:

1. That it is likely to ultimately succeed on the merits of its claim;

2. That it does not have an adequate remedy at law and will suffer irreparable harm before the case can be litigated on the merits if the injunction is not granted;

3. That such harm outweighs any harm that the adverse party will suffer if the injunction is granted; and

4. That the requested injunction will not adversely affect the public interest.

*Collazo Rivera v. Torres–Gaztambide,* 812 F.2d 258, 259 (1st Cir.1987); *Planned Parenthood League of Mass. v. Bellotti,* 641 F.2d 1006, 1009 (1st Cir.1981); *Bertoncini v. City of Providence,* 767 F.Supp. 1194, 1197 (D.R.I.1991).

### *Analysis*

#### I. *Likelihood of Success on the Merits*

##### A. The Contract Claim

■ A contract arises when the parties manifest their mutual assent to its terms and consideration is given. *Rhode Island Five v. Med. Assoc. of Bristol County, Inc.,* 668 A.2d 1250, 1253 (R.I. 1996); *Smith v. Boyd,* 553 A.2d 131, 133 (R.I.1989); *see also* John D. Calamari & Joseph M. Perillo, The Law of Contracts § 2.1 (3d ed.1987) [hereinafter "Calamari on Contracts"]; Laurence P. Simpson, Handbook on the Law of Contracts § 3 (1954) [hereinafter "Simpson on Contracts"]. Ordinarily, the expression of mutual assent takes the form of an offer by one party manifesting its willingness to enter into the proposed agreement and an acceptance of that offer by the other party. *Smith,* 553 A.2d at 133. In determining whether a contract exists, it is the words, conduct and other objective manifestations of intent that govern, but subjective intent may be considered in making that determination. *Bourque v. Fed. Deposit Ins. Corp.,* 42 F.3d 704, 708 (1st Cir.1994) (citations omitted).

■ In the case of a bilateral contract, acceptance consists of a promise by the offeree to render the bargained-for performance. *B & D Appraisals v. Gaudette Mach. Movers Inc.,* 733 F.Supp. 505, 507–08 (D.R.I.1990). In the case of a unilateral contract, on the other hand, the offer invites and is accepted by actual performance. *Id.* at 508.

■ In this case, the October 15 letter, particularly when considered in conjunction with what applicants were told when they appeared before the Majors' Board, is a classic example of an offer to enter into a unilateral contract. The October 15 letter expressly stated that it was a "conditional offer of employment" and the message that it conveyed was that the recipient would be admitted into the 61st Academy if he or she successfully completed the medical and psychological examinations, requirements that the City could not lawfully impose unless it was making a conditional offer of employment. *See* 42 U.S.C. § 12112(d)(2)(A).

Moreover, the terms of that offer were perfectly consistent with what applicants had been told when they appeared before the Majors' Board. At that time, Major Simoneau informed them that, if they "passed" the Majors' Board, they would be offered a place in the Academy provided that they also passed medical and psychological examinations.

The October 15 letter also was in marked contrast to notices sent to applicants by the City at earlier stages of the selection process. Those notices merely informed applicants that they had completed a step in the process and remained eligible to be considered for admission into the Academy. Unlike the October 15 letter, the prior notices did not purport to extend a "conditional offer" of admission.

■ The plaintiffs accepted the City's offer of admission into the Academy by satisfying the specified conditions. Each of the plaintiffs submitted to and passed lengthy and intrusive medical and psychological examinations. In addition, many of the plaintiffs, in reliance on the City's offer, jeopardized their standing with their

existing employers by notifying the employers of their anticipated departure, and some plaintiffs passed up opportunities for other employment. *See Alix v. Alix,* 497 A.2d 18, 21 (R.I.1985) (under the doctrine of promissory estoppel, an offeror whose promise induces an offeree to act or forbear to act is estopped from claiming the contract is invalid for lack of consideration) (*citing* Restatement (Second) of Contracts § 90 (1981)).

■ The City argues that the October 15 letter should not be construed as a conditional offer of admission to the Academy because the third paragraph stated that the number of qualified applicants exceeded the number of available slots and that an "actual offer of employment" would not be made until "all of the results are known." This Court rejects that argument for several reasons.

First, at most, that paragraph may make ambiguous what, otherwise, was the clear and unequivocal offer set forth in the first two paragraphs that the recipient would be accepted into the 61st Academy if the recipient passed medical and psychological examinations. Since the defendants drafted the October 15 letter, if the letter contains an ambiguity that makes it susceptible to more than one reasonable interpretation, the letter should be construed in the manner most favorable to the plaintiffs. *Employers Mutual Cas. Co. v. Pires,* 723 A.2d 295, 298 (R.I.1999) (insurance policy construed in favor of the insured and against the insurer); *Fryzel v. Domestic Credit Corp.,* 120 R.I. 92, 385 A.2d 663, 666–67 (1978) (ambiguities in a contract must be construed against the drafter of the document); *A.C. Beals v. Rhode Island Hosp.,* 110 R.I. 275, 292 A.2d 865, 872 (1972) (any ambiguities or omissions in an agreement construed against the drafting party).

Here, the only ambiguity would be whether an applicant's admission to the Academy also was conditioned upon a final decision regarding the size of the class. Such an interpretation is, at least, debatable because, while an additional condition might be inferred from the statement that the number of qualified applicants exceeded the number of available slots, that inference appears to be inconsistent with the statement that an "actual offer of employment will not be made until all of the results are known". Since the only "results" not known when the October 15 letter was sent were the results of the medical and psychological examinations, the statement suggests that successful completion of those examinations were the only requirements on which the offer of admission was conditioned.

However, even assuming, *arguendo,* that the October 15 letter should be construed as making a decision fixing the size of the Academy class at forty an additional condition of admission, that condition was satisfied. A final decision has been made fixing the size of the Academy at forty recruits. Indeed, as already noted it appears that unbeknownst to Lt. Cohen, the decision had been made before the October 15 letter was sent.

Nor is there any question that the City intended to admit all of the recipients of the October 15 letter who passed the medical and psychological examinations provided that the Academy class consisted of forty recruits. Lt. Cohen, who drafted the letter, testified that the language relied upon by the defendants was included only because it was his understanding that a final decision had not yet been made regarding class size. He acknowledged that he sent only forty-two or forty-three letters in the expectation that no more than forty would pass both the medical and

psychological examinations and that all of them would be admitted into the Academy.

The City argues that there is no contract between the parties because the plaintiffs have no legally-enforceable right to employment. The City correctly points out that, even if the plaintiffs graduate from the Academy and there are existing vacancies in the Department, they would be required to serve a one-year probationary period during which they could be terminated without cause which would make them employees at will who, under Rhode Island law, have no right to continued employment. *Southland v. Town Council of South Kingstown*, 108 R.I. 738, 279 A.2d 441, 442, 444 (1971). That argument misses the point. The contract that the plaintiffs seek to enforce is not a contract that they will be appointed as permanent Providence police officers; rather, it is a contract that they would be admitted to the Academy if they passed the medical and psychological examinations.

The City also argues that the plaintiffs did not even have a contractual right to be admitted into the Academy because, in their applications to become police officers, they acknowledged understanding that successful completion of each step in the evaluation process did not necessarily guarantee acceptance into the Academy. That argument overlooks the fact that the October 15 letter was more than a mere notification that the plaintiffs had successfully completed another step in the evaluation process. As already noted, it was a conditional offer of admission to the 61st Academy which the plaintiffs accepted by performing the specified conditions.

█ Finally, the City argues that, because the plaintiffs were not required to attend the Academy or become Providence police officers, the mutuality of obligation necessary to establish a binding contract was lacking. The flaw in that argument is that, while mutuality of obligation is an essential element of a bilateral contract, *Crellin Tech., Inc. v. Equipmentlease Corp.*, 18 F.3d 1, 7 (1st Cir.1994), it is not required to establish a unilateral contract. *B & D Appraisals*, 733 F.Supp. at 508 ("In a unilateral contract, no mutuality of obligation exists—only the promisor becomes bound when the promisee executes the bargained for act."); Calamari on Contracts § 4–12(c); Simpson on Contracts § 37. Performance by the offeree is sufficient to create a unilateral contract. *B & D Appraisals*, 733 F.Supp. at 508.

### B. The Due Process Claim

█ The Fourteenth Amendment prohibits a state or its subdivisions from depriving any person of "property" without due process of law. U.S. CONST. amend. XIV, § 1. Due process has both a substantive component that protects against arbitrary and capricious infringements and a procedural component requiring that the methods employed satisfy constitutional standards of fundamental fairness. *See Smithfield Concerned Citizens for Fair Zoning v. Town of Smithfield*, 719 F.Supp. 75, 80–81, 83 (D.R.I. 1989). Procedural due process is a flexible standard that "calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). Generally, procedural due process requires notice of the proposed action and an opportunity to be heard. *Gorman v. Univ. of Rhode Island*, 837 F.2d 7, 12 (1st Cir.1988).

█ In this case, it is clear that the plaintiffs were afforded neither. They learned, second hand and after the fact, that the selection criteria had been changed and that they would not be invited to participate in the 61st Academy. Moreover, they received no explanation of the

reasons for that decision and were not afforded any opportunity to contest it. Accordingly, the only issue presented is whether they had a constitutionally-protected property interest in attending the Academy.

The "property" that is protected by the due process clause encompasses more than an ownership interest in real estate, chattels, or money. *Bd. of Regents of State Coll. v. Roth,* 408 U.S. 564, 571–72, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). It also includes an interest in a specific benefit. *Id.* at 576, 92 S.Ct. 2701. However, the interest must consist of something more than an "abstract need or desire" for the benefit or a "unilateral expectation" of receiving it. *Id.* at 577, 92 S.Ct. 2701. The party asserting the property interest must demonstrate "a legitimate claim of entitlement" to the benefit in question. *Id.*

The existence and scope of property rights are determined by reference to state law. *Bishop v. Wood,* 426 U.S. 341, 344, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); *Howard v. State of Rhode Island Water Res. Bd.,* C.A. No. 96–064T, slip op. at 5 (D.R.I. December 31, 1996). However, it is federal law that determines whether a property right rises to the level of a constitutionally-protected property interest. *Memphis Light, Gas and Water Div. v. Craft,* 436 U.S. 1, 9, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978).

In determining whether a claimed entitlement to a benefit is a property right, the relevant inquiry is whether there are "rules or mutually explicit understandings that support [the] claim of entitlement to the benefit." *Perry v. Sindermann,* 408 U.S. 593, 601, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (property interest can arise from rules, policies, or contract); *see also Bishop,* 426 U.S. at 344, 96 S.Ct. 2074 (a

property interest can be created by ordinance or implied contract); *Roth,* 408 U.S. at 577, 92 S.Ct. 2701 (property interests are created by rules or understandings arising from state law).

A valid contract may be sufficient to support a claim of entitlement. *Perry,* 408 U.S. at 601, 92 S.Ct. 2694 (employment contract); *Marrero–Garcia v. Irizarry,* 33 F.3d 117, 121 (1ST Cir.1994) (contract for water service). However, not every contract recognized by state law creates a constitutionally-protected property interest. *San Bernardino Physicians' Servs. Med. Group, Inc., v. County of San Bernardino,* 825 F.2d 1404, 1408 (9th Cir. 1987). If that were the case, every breach of contract action against a state or municipality would be converted into a federal constitutional case. *Women's Dev. Corp. v. City of Central Falls,* 968 F.Supp. 786, 789 (D.R.I.1997). Whether a contractual claim rises to the level of a constitutionally-protected property interest turns on how closely related the contractual right is to an important interest such as employment. *San Bernardino,* 825 F.2d at 1409–10.

In this case, there was a "mutually explicit understanding" that the plaintiffs would be admitted to the 61st Academy if they passed the medical and psychological examinations. Indeed, as already noted, that understanding rose to the level of a binding contract. Moreover, while admission to the Academy was not a guarantee of ultimate employment, it was a *sine qua non.* The City had an established policy of hiring only individuals who graduated from the Academy. Consequently, the plaintiffs have a legitimate claim of entitlement to admission into the 61st Academy that qualifies as "property" protected by the due process clause.

Support for the plaintiffs' due process claim may be found in *Stana v. Sch. Dist.*

*of the City of Pittsburgh*, 775 F.2d 122 (3rd Cir.1985). In *Stana*, the plaintiff was a teacher who alleged that the Pittsburgh School District violated her due process rights when they removed her from a list of persons eligible to be hired as teachers. State law required the school district to maintain an eligibility list and to hire only from among the top three individuals on that list. Despite an established policy of maintaining individuals on the list for a period of two years, the school district removed the plaintiff from the list, without giving her an opportunity to be heard, after receiving a negative evaluation of her performance from the principal of a private school where she was teaching. When a vacancy occurred and the only other person on the list was unavailable, the school district hired a teacher not on the list to fill it. The Third Circuit held that:

> ... remaining on the eligibility list, which was a prerequisite to a teaching position, was a "legitimate entitlement" that the School District had created through the policies it promulgated to implement the state statute on teacher hiring. As such, it represented both an existing policy or rule and an explicit understanding sufficient to constitute a property interest, which triggered the requirement for an inquiry that comported with procedural due process.

*Stana*, 775 F.2d at 126–27 (citations omitted).

Further support for the plaintiffs' due process claim also may be found in *Martin v. Helstad*, 578 F.Supp. 1473 (W.D.Wis. 1983). There, the plaintiff applied for admission to law school while incarcerated in federal prison. On his application, the plaintiff disclosed that he had been convicted of a crime but he was less than forthcoming in providing the details. Upon receiving a letter of acceptance, the plaintiff contracted to rent housing in the town where the law school was located. Later, the law school learned the details of the plaintiff's conviction, and gave him an opportunity to explain his failure to make full disclosure. When the plaintiff failed to provide an explanation satisfactory to the law school, his admission was rescinded on the ground that the decision to admit him had been conditioned on full and truthful answers to the questions on the application form. The court rejected the plaintiff's procedural due process claim on the ground that he had received all of the process due under the circumstances. However, the court found that, unless the plaintiff's conduct was fraudulent, his admission created a constitutionally-protected property interest, albeit only a "slight" one, because:

> An offer of admission to a law school and the subsequent acceptance of that offer create a mutually explicit understanding that the accepted applicant will be admitted. The accepted applicant relies on the acceptance in foregoing offers from other law schools, and in contracting for housing, and in making other preparations for attendance ... Also, because admission to an accredited law school is the first step in acquiring the skills and credentials for a professional career in law, revocation of admission constitutes a deprivation to the individual involved.

*Martin*, 578 F.Supp. at 1481.

The analogy to the case of an individual applying for admission to a university is an apt one because admission to a university itself, like admission to a police academy, has no intrinsic value. What does have value and what the applicant seeks is an education or training, and the opportunity to obtain a "good job." However, because admission is a prerequisite to achieving those goals, it is a significant "benefit."

Therefore, a letter of acceptance into either a university or a police academy, coupled with the recipient's reliance on that acceptance, creates a property interest that is entitled to protection under the due process clause. While that interest may be of lesser magnitude than the interest in "a good job"; and, therefore, may not be entitled to the same level of procedural protection, an individual cannot be deprived of that interest without some level of due process. *See id.* at 1482.

The defendants' reliance on *Flood v. County of Suffolk,* 820 F.Supp. 709 (E.D.N.Y.1993) and *Atkinson v. City of Dayton,* 99 F.Supp.2d 846 (S.D.Ohio 1998) is misplaced for several reasons. In *Flood,* the plaintiff applied for a position with the Suffolk County Police Department (SCPD); and, after taking a polygraph test, she was placed on an eligibility list. Later, the SCPD learned of various "inaccuracies" on the plaintiff's application regarding her prior drug use; and, when the plaintiff refused to take a second polygraph test, her name was removed from the eligibility list. The plaintiff claimed that the removal deprived her of a property right in the "appointment process" but the court rejected that claim on the ground that the plaintiff's inclusion on the eligibility list created "nothing more than an expectation of being appointed to the SCPD." 820 F.Supp. at 713.

*Flood* is readily distinguishable from this case because, here, the plaintiffs were not merely on a list of those "eligible" for admission to the 61st Academy; rather, they had been conditionally admitted and had satisfied the conditions. Moreover, in this case, there is no suggestion that the plaintiffs gained admission into the Academy by fraud.

In *Atkinson,* the plaintiffs had been selected to participate in the Dayton Police Academy but the Dayton Fraternal Order of Police (FOP) obtained an injunction that prevented the academy from being conducted on the ground that the plaintiffs had been selected in violation of a collective bargaining agreement that prohibited the city from hiring applicants who had ever used or trafficked in a controlled substance. The plaintiffs brought a § 1983 action claiming that they had been deprived of their "liberty and property interests in police academy positions and the concomitant opportunity to become permanent Dayton police officers." 99 F.Supp.2d at 850. The court rejected that claim on the ground that the plaintiffs had no property interest in *employment as police officers* for two reasons. First, police recruits were required to serve a probationary period and, under Ohio law, probationary employees did not possess a property interest in government employment. *Id.* at 851. Second, the court found that the plaintiffs had no contractual right to employment because, under Ohio law, public employees hold office "as a matter of law and not of contract", *id.* at 852; and, in any event, "the notices from the City were insufficient, as a matter of law, to constitute a contractual agreement." *Id.*

*Atkinson* is not persuasive because it did not address whether the plaintiffs had a property interest in their *admission to the academy.* Furthermore, in this case, the October 15 letter, coupled with the statements by Major Simoneau and the City's acknowledged intent to admit all recipients of the October 15 letter who passed the medical and psychological examinations were sufficient to support the existence of a contract.

To summarize, the City may select police officers in whatever manner it deems appropriate as long as the method chosen is lawful. It is not the Court's prerogative to decide which lawful method is preferable. However, once a method has been

chosen, the City cannot "change the rules in the middle of the game". The City cannot renege on commitments made to individuals selected pursuant to that method, and reasonably relied upon by them, by retroactively changing the method of selection unless there is a compelling reason for doing so.

In this case, no compelling reason has been established. In light of rumors and revelations made during the "Plumderdome" case regarding past attempts to improperly influence the selection of Providence police officers, it is easy to understand Chief Esserman's preference for what he viewed as a less subjective selection process.[4] However, there is no suggestion that the process of selecting recruits for the 61st Academy was tainted by favoritism, political influence, or fraud. On the contrary, the evidence shows that Major Simoneau was chosen to chair the Majors' Board because of his past efforts to prevent and expose attempts to improperly influence the selection process. Moreover, it seems unlikely that the plaintiffs were favored because they were passed over in selecting recruits for the 60th Academy. Nor does the City contend that any of the plaintiffs here are in any way unqualified to be police officers. Accordingly, this Court finds that the plaintiffs have demonstrated a strong likelihood that they will succeed on the merits of their claims.

## II. *Irreparable Harm to Plaintiffs*

 A preliminary injunction is appropriate only where there would be no adequate remedy at law available to the party seeking the injunction if that party ultimately prevails. *Sampson v. Murray*, 415 U.S. 61, 88, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974) (the basis of injunctive relief in the federal courts has always been irreparable harm and the inadequacies of legal remedies). Generally, the party seeking the injunction must establish that its loss cannot be measured in terms of money damages or that money damages would not provide adequate compensation. *Ross–Simons of Warwick v. Baccarat, Inc.*, 102 F.3d 12, 18 (1st Cir.1996).

Here, the plaintiffs have made that showing. Unless a preliminary injunction is granted, they will not be included in the 61st Academy; and, therefore, will not be eligible for consideration as Providence police officers. Furthermore, there is no guarantee that another academy will be conducted at any time in the near future or that the plaintiffs would be selected to participate. *See O'Neill v. Commonwealth of Massachusetts*, No. Civ.A. 02–10233–GAO, 2002 WL 342675 at *3 (D.Mass. March 1, 2002).

Moreover, even if the plaintiffs were assured a position in a future academy, it would be impossible to restore their lost seniority rights or to attach a dollar value to that loss. The evidence shows that seniority affects job assignments, shift assignments, vacation selection, promotions and layoffs. Since it would be virtually impossible for the Court to restore their seniority, or to measure its value, the plaintiffs, if successful, will be irreparably harmed if they are excluded from the 61st Academy. *See Bertoncini*, 767 F.Supp. at 1197.

## III. *Harm to Defendants*

 The City contends that if a preliminary injunction is granted, it will suffer some hardship because including the plaintiffs in the Academy would expand the

---

4. It should be noted that one of the past abuses involved advance disclosure of answers to the questions on the written examination, one of the *objective* components of the selection process.

recruit class to a size that would make it difficult to effectively manage; would require more staff and would lengthen the duration of the Academy two to four weeks.

However, those burdens would result from a situation of the City's own making. It was the City that retroactively changed the selection process and invited other applicants to fill the slots previously promised to the plaintiffs. Therefore, the City cannot cite the possible consequences of that decision as a hardship that weighs against granting a preliminary injunction.

Moreover, including the plaintiffs in the Academy need not necessarily increase the size of the recruit class. There is no evidence that the City has made binding commitments to the applicants that it has selected to replace the plaintiffs. Consequently, there is no apparent reason why those applicants could not be disinvited in order to maintain a class size of forty recruits.

In any event, even if the City increases the size of the recruit class from forty to fifty-four in order to accommodate the plaintiffs, any resulting "harm" that it suffers clearly would be outweighed by the harm to the plaintiffs if an injunction is not granted. Essentially, the alleged harm to the City would consist of the relatively modest expense of hiring additional instructors and arranging to use facilities that can accommodate a larger number of recruits. The fact that past academies have included as many as fifty-eight recruits is compelling evidence that any hardship imposed would be minimal.

Consequently, the balancing of the harms component of the preliminary injunction test weighs very heavily in favor of granting the requested injunction.

IV. *The Public Interest*

The effect that granting or denying a preliminary injunction might have on the public interest provides little guidance in this case because two conflicting and equally important public interests are involved.

On the one hand, the public has a strong interest in ensuring that the process of selecting police officers is impartial and designed to produce the most qualified applicants. On the other hand, the public has an equally strong interest in ensuring that the process is fair to applicants and that, once commitments are made and relied upon, those commitments are honored.

In this case, there is evidence that the process by which the plaintiffs were selected may not have been a "best practice". However, there is no indication that the process was tainted or that any of the plaintiffs are unqualified and there, also, is compelling evidence that the City has made promises to the plaintiffs that ought to be honored.

Thus, based on the evidence presented, to the extent that there is any discernible public interest in the course to be followed, that interest would be best served by granting the requested injunction.

### Conclusion

For all of the foregoing reasons, the plaintiffs' application for a preliminary injunction enjoining the 61st Academy unless they are allowed to participate is granted.

IT IS SO ORDERED.

### Attachment

COLONEL GUIDO A LAORENZA

CHIEF OF POLICE

Department of Public Safety,
Police Department

*"Building Pride in Providence"*

Tuesday, October *15,* 2002

DEREK ARDITO
300 ADMIRAL STREET
PROVIDENCE, RI 02908

Dear DEREK

Following your oral evaluation you placed high enough to make you eligible to be accepted into the *61st* Training Academy Class of this department, depending upon you successfully passing the next two phases of the process. These are the psychological examinations and the medical examinations.

The projected date to commence the $_{61}$st Training Academy Class is currently unknown, but it is anticipated that it will begin sometime after the beginning of November of 2002. This letter is to serve as a conditional offer of employment and your selection as a participant in the Academy Class is dependent upon your successful completion of the two remaining phases of the evaluation process. At the present time it is anticipated that the $_{61}$st Recruit Class will be comprised of between thirty (30) and forty (40) recruits.

Due to the number of qualified applicants, there are more candidates then positions in the 61st Recruit Class. Therefore, an actual offer of employment will not be made until all of the results are known. It is imperative that if you are presently employed you should discuss the issue of notice with your employer; however, the final results of the process will not be known for some time.

Your appointment date for the psychological examination shall be on 10/22/2002 at 9:00 AM, and you should plan on it taking most of the day. This will be located at the URI/Feinstein College of Continuing Education 80 Washington Street Providence, RI. It will he in room 303.

Your appointment date for your medical examination is on 10/29/2002. This examination will require fasting from midnight the evening before your examination. There also will be a drug screening. You will be required to report at 6:30 AM to Occupational Health & Rehabilitation, 203 Concord Street, Suite 301 Pawtucket, RI 02860. This will take approximately three and one half (3.5) hours.

If you have any questions regarding this matter, you may call the Human Resource Bureau at 243-6411

Please be advised that if you are accepted, you will be expected to perform a preliminary physical fitness that is the same as the application process assessment. It is highly recommended that you begin getting yourself ready to ensure that you are able to perform at a passing level in the assessment. Attached is the chart representing the 40th percentile of the Cooper Standards that we currently utilize as a minimum standard.

Respectfully,

Colonel Guido A Laorenza

Chief of Police