William Mertens, J.
The plaintiffs have brought this action seeking a) equitable relief to bar large scale dismissals by the defendants of sanitationmen, b) a declaratory judgment and specific performance of alleged contractual rights under a collective bargaining agreement or c) damages for alleged breach of such contract.
The litigation arises in connection with an unprecedented financial crisis confronting the defendant City of New York (the "city”) and involves the right of the defendant city to make large scale layoffs of sanitationmen as part of a massive effort by the city to reduce its expenses in the light of its financial crisis.
An application by the plaintiffs for a preliminary injunction to stay the layoffs of sanitationmen was granted at Special Term but the order granting such stay was reversed by the Appellate Division which denied the application for a preliminary injunction and remanded the case for immediate trial.
The city has pleaded several affirmative defenses to the complaint, namely: 1) that the collective bargaining agreement does not guarantee the sanitationmen job security for the two-year period of the contract but only spells out the formula for wages; 2) that if the agreement is construed to *204 guarantee job security it is invalid by reason of subdivision b of section 1173-4.3 of the Administrative Code of the City of New York; 3) that if construed to guarantee job security the agreement violates public policy, and 4) that the plaintiffs are not entitled to equitable relief because plaintiffs do not come into court with clean hands.
In substance, the plaintiffs’ claim is founded upon provisions of the collective bargaining agreement entered into between the Uniformed Sanitationmen’s Association, Local 831, I.B.T. (the "USA” or "the union”) and the city as of July 1, 1974 (the "agreement” or "contract”). The agreement covers the rights of the parties for the two-year period beginning July 1, 1974 and ending June 30, 1976.
It is the contention of the plaintiffs that under the first paragraph of section 1 of article III of the agreement (said article being captioned "Salaries”) the union’s members are guaranteed job security for the two-year period from July 1, 1974 to June 30, 1976 which renders them immune from the massive layoffs of city employees which the city is now directing in order to cope with its financial crisis. The city contends that this section does not create a contractual right of job security but only establishes a guaranteed annual wage rate and does not bar the city from the layoff of sanitationmen during the term of the agreement for economic reasons. The city contends that the layoff of sanitationmen was and is simply a part of its overall program for a massive reduction in the number of city employees occasioned by its financial crisis and does not constitute a breach of section 1 of the agreement.
The first paragraph of section 1 reads as follows: "The City agrees to employ each of the employees for the period between July 1, 1974 and June 30, 1976 for 261 (8 hour) working days per annum at the respective annual compensations set forth in Schedule 'A’ of this Article III.” The text of schedule "A” refers to "annual rate” of compensation.
The complaint was amended at the trial to bring all factual data relating to layoffs and categories of city employment up to date as far as possible.
The basic question to be determined is the construction of section 1 of the agreement. Does it create an obligation guaranteeing job security for the two-year period covered by the contract or does it only establish a guaranteed annual wage rate? The Appellate Division in remanding the case for trial recognized that the meaning of section 1 may be ambigú *205 ous and thus directed that the facts be determined as to the negotiations and background which led to the incorporation of this language in the agreement.
It now appears clear after trial that the language was developed in city contracts with sanitationmen long before its incorporation in the 1974 agreement. It has a history dating back to an agreement made in 1949. It was incorporated into the next agreement in 1954 and has been incorporated without any substantial change into every agreement between the city and the sanitationmen from 1954 to 1974. The format has always remained the same; each subsequent agreement simply modifying the figures for annual compensation; the total number of days upon which the annual rate is determined and the new time period to be covered by the contract.
The origin of the language is now clear. This provision was agreed upon as a substitute for the cumbersome procedure for the assertion of the rights of the sanitationmen against the city under section 220 of the Labor Law. Prior to 1949 sanitationmen asserted rights to the prevailing rate of wages and filed claims against the city under section 220 seeking to recover compensation additional to that which they had already been paid. The path to recovering such additional compensation was a long and arduous one. It involved individual retainers to attorneys to prosecute these claims for and at the expense of the individual sanitationmen. Receipt of the extra money might be long delayed as the process of hearings and appeals took their course. On the other hand when finally determined the city might be confronted with an extraordinary payment to be made in one year but reflecting claims involving a long period of time.
In 1949 an agreement was negotiated between Mayor O’Dwyer, Mr. DeLury representing sanitationmen and Martin T. Lacey (President of the Central Labor Council). This agreement disposed of many back payment claims by sanitationmen and provided for their future employment upon the basis of an annual wage rate for the term of the agreement. In every material respect, except for figures and dates, the language of this 1949 agreement has been carried into every subsequent agreement including the current agreement.
The 1949 agreement disposing of long-time back claims and establishing the right of the sanitationmen to be paid upon the basis of an annual wage with waiver and release of all claims they might have under section 220 of the Labor Law *206 was beneficial to both sides to the agreement. The city eliminated the cumbersome procedure required for the processing of claims under section 220 with its consequential eventual large payment in a particular year of claims accummulated over many years. The employees also avoided the cumbersome and expensive procedure under section 220; obtained the prospect of receiving their full compensation currently; and it was established that payment would be on the basis of an annual rate. More significantly, as USA developed its representation of the sanitationmen it was able to make a greater input into the negotiation of annual compensation and fringe benefits and thus gave the strength of union to the individual sanitationmen. The concept of compensation embodied in the 1949 agreement coupled with the waiver of the individual employee’s rights under section 220 of the Labor Law has been carried forward into every agreement since 1949.
The language employed in these agreements with the sanitationmen apparently goes back to an earlier agreement in 1947 between the city and the blacksmiths which eliminated the cumbersome procedure under section 220 for the blacksmiths. That agreement was negotiated for the blacksmiths by Jack Bigel who assisted in the 1954 negotiations involving the sanitationmen.
Although the union representatives now contend that this language embodied in section 1 was always considered by them to be a guarantee of job security it is significant that at no time from 1949 until a few weeks before this litigation did the union contend in any publications or communications to its members that it had obtained guaranteed job security through this language; even though it published promotional material reciting its accomplishments.
The origin and raison d’etre of section 1 having been established, the next inquiry must relate to the negotiations for the 1974 agreement. It is clear on the record that section 1 was not the subject of negotiation in 1974 except as to the figures; the basic format established in 1949 was simply carried into the 1974 agreement. It is clear that between 1949 and July 16, 1974 the subject of guaranteed job security was never discussed in the periodic negotiations. It is now contended by the USA that on July 16, 1974, when final negotiations for the 1974 agreement extended over a 17-hour period involving many persons, that Messrs. DeLury and Bigel, on behalf of the *207 USA, obtained a confirmation of their unilateral interpretation that section 1 established a contractual obligation of guaranteed job security. They testified that when they were alone with Mr. James Cavanagh, the Deputy Mayor (no others being present at these two occasions, one at midday and one in late evening or about midnight) they discussed with him the productivity clause now found in article VA of the agreement. They testified that Mr. Cavanagh not only advised them that the proposed productivity clause would not result in layoffs since the problem created by increased productivity could be handled by the process of attrition; but that Mr. Cavanagh, in response to their alleged assertion of rights of job security under section 1, stated in substance that he recognized the union had job security under that section of the contract. Mr. Cavanagh on the other hand testified that there was no discussion of job security under section 1 at these meetings; that his only discussion with Messrs. DeLury and Bigel related to the handling of any layoffs occasioned by increased productivity through the process of attrition and that no mention of section 1 was made at any time. Mr. Hediger, First Deputy Director of the city’s office of Labor Relations who also participated in the 1974 negotiations, has also testified that he never had any discussions with anyone with respect to job security at any time during the 1974 negotiations. On the entire record before it the court finds that there was in fact no discussion at any time in the 1974 negotiations involving any claim by the union of guaranteed job security under section 1; nor was any such claim ever made by the union in the 1974 negotiations.
Analysis of the agreement itself compels the conclusion that the parties to the 1949 agreement and all subsequent agreements embodying the basic text of section 1, including the current 1974 agreement, did not intend to impose upon the city by this language a contractual obligation to guarantee job security, but only sought to eliminate the cumbersome and costly section 220 procedures and to establish the formula for compensation upon the basis of an annual wage. The provision with respect to a specified number of "working days per annum at the respective annual compensations set forth in Schedule 'A’” is simply a statement of the number of days upon which the annual rate is based; thus affording a base for the computation of daily, overtime or holiday work or night differential provided for in other paragraphs of article III and *208 in which we find references to "basic wage rate” and "prorated daily rate”. Schedule "A” sets forth the "annual rate”.
The plaintiff contends that the use in section 1 of the word "each” compels acceptance of its interpretation that job security is accorded to each employee. This is untenable. On the record of this trial which has developed the history of section 1 it is clear that the word "each” was required because initially each employee had to sign the indenture agreement in order to effectively waive his rights under section 220. The present agreement between the city and the union still requires that each man individually execute a waiver of rights under section 220 (see article VI of the agreement).
It is also appropriate to make note of a number of agreements with other city employees (marine and ferry personnel) placed in evidence which contain language virtually identical to section 1. These agreements, as were those involving the sanitationmen, were intended to substitute annual wage rates in lieu of claims under section 220. However, these agreements were also intended to give a limited job security and they thus contain additional provisions to effectuate that limited job security. Such provisions are not found in the agreements of the sanitationmen. The absence of such specific provision in the sanitationmen’s agreements seem clearly to indicate that job security was not intended to be given to the sanitationmen.
The court on this record therefore concludes that section 1 of the 1974 agreement does not create a contractual guarantee of job security and is no bar to dismissals directed by the city because of the financial crisis confronting the city. There can, of course, be no question that the unprecedented financial crisis facing the city is a "legitimate reason” under section 1173 of the Administrative Code upon which to base the layoffs being made by the city. The city’s dismissal of sanitationmen does not constitute a breach of the 1974 agreement.
The only remaining issue is the contention of the plaintiffs that the sanitationmen have a right to have the city discharge all exempt, noncompetitive, provisional and per diem employees and to terminate all contracts or arrangements for the employment of consultants and experts before dismissing any sanitationmen. The Civil Service Law provides for the structuring of municipal employment. It specifically authorizes employment of persons in the several categories enumerated *209 above as well as the category of competitive civil service in which the sanitationmen fall. There is, of course, no question of the right of the city to employ consultants and experts. The question in law before the court is very simply whether there is any order of priority prescribed for the city to follow in an unprecedented financial crisis requiring it to make layoffs on a massive scale never before made in the city’s history. No authority for the judiciary to define an order of priority has been brought to the attention of the court. No statutory authority covers this problem of priorities. Cases dealing with isolated instances of wrongful discharge of a competitive civil service employee who has been replaced by an exempt or provisional employee (see, for example, Matter of Danker v Department of Health of City of N. Y., 153 Misc 502, affd 242 App Div 765, affd 266 NY 365) are not controlling in this factual pattern. We are dealing here with a claim by the plaintiffs that all classes of employees (and all experts and consultants), other than competitive civil service employees, are to be discharged before any civil service employee can be discharged. There is no basis in law to support this proposition. The chief executive of the city, not the judiciary, must have, and in fact does have, the power to determine the order of priorities in the discharge of municipal employees in the unprecedented situation confronting the city. There is sufficient in this record with respect to the requirements of city operations to establish that the discharge process must be selective in order that the city may function and that the entire problem is under continuous review by the executive branch of the city. It would be unwarranted in law and wholly impractical for the judiciary to usurp the executive power to determine who goes and who stays in this unprecedented crisis.
The defendants are entitled to judgment dismissing the first and third causes of action of the complaint. The second cause of action is also dismissed since the plaintiffs are not entitled to the specific declaration of their rights as prayed for in the complaint. However, in view of the defendants’ countermotion at the close of the trial for appropriate declaratory relief in their favor the judgment to be entered herein shall specifically declare and adjudicate, pursuant to CPLR 3001, that the city is not obligated to employ each person employed as of July 1, 1974 in the title of sanitationman for the period between July 1, 1974 and June 30, 1976 and may discharge any such *210 sanitationman as may be determined by it in coping with its financial crisis.
All motions at the trial upon which decision was reserved are disposed of in accordance with the foregoing.
Judgment may provide for costs and disbursements to the defendants.