DECISION
Local 732 of the International Association of Firefighters AFL-CIO ("Local 732") seek a preliminary injunction asking this Court to enjoin the City of Woonsocket from temporarily laying off of a number of the City's firefighters.
For the reasons set forth in this Decision, Local 732's motion for preliminary injunction is denied.
 FACTS
The City of Woonsocket is in an extremely perilous fiscal status. The City of Woonsocket is a mill city of approximately 43,000 residents located on 7.7 square miles in northern Rhode Island.[1] This distressed community suffers one of the highest unemployment rates in Rhode Island at 11.2% and as of the 2000 U.S. Census had a yearly per capita income of only $16,000.00. The City of Woonsocket employs *Page 2 
approximately 350 municipal employees. The employees of the City consist of three basis groups: 133 Fire Department employees, 101 Police Department employees and 114 Municipal employees. This information was provided by the City and was agreed upon by Local 732.
International Association of Firefighters, hereinafter referred to as (Local 732), is the exclusive bargaining representative for all permanent fire fighters employed by the City of Woonsocket. International Brotherhood of Police Officers, Local 404 is the exclusive bargaining representative for all permanent police officers employed by the City of Woonsocket. The third group consists of two unions and non-union employees. The third group (City Hall employees) is not involved in this lawsuit as concession agreements have been reached with the two municipal unions.
The City of Woonsocket Adopted Municipal Budget for fiscal year 7/l/08-6/30/09 is $113,834.717. Of this figure, $62,943.024 is delegated to the Woonsocket Education Department and $50,891,693 for municipal government. In recent months, City officials have determined:
1. The Woonsocket Education Department is running a significant deficit estimated in January 2009 at approximately $1,050,000.00.
2. The State has completely eliminated the $3,200,000 municipal general revenue sharing originally budgeted for the City of Woonsocket as well as $416,000 for distressed communities.
3. Three land sales the City was relying upon for significant revenue have not been consummated due to the downturn in the real estate market. The total projected lost revenue would have been $1,900,000. *Page 3 
4. The City's bond rating is now BBB + two grades above junk status. This rating has repercussions including concern about the projected sale of $65,000,00 in municipal bonds to finance the on-going Middle School Construction Project.
The City has been in a cash flow crisis which would have had devastating results. The City has been attempting to negotiate a tax anticipation note since December 2008. Without additional monies, the City would run out of money in March of 2009. The City would be unable to pay its bills and wound end with a negative cash balance on March 30, 2009. (Plaintiff's Ex.1.)[2]
Faced with significant State revenue cuts, increasing deficits incurred by Woonsocket Education Department, nearly depleted surplus and Charter and State Statutory mandates to decrease expenditures when faced with decreased revenue, the City developed a plan to address the revenue shortfall. The City Plan was aimed at reducing the revenue shortfall through employee layoffs, employee wage and benefit concession agreements, curbside trash pickup fees, use of funds in contingency account, privatization of sewer crew, and the sale of short term anticipation notes.
In late December, 2008, the City determined it had a projected deficit of approximately $4,600,000.
The City administration drafted and submitted a plan to the City Council on January 25, 2009 to attempt to deal with this fiscal crisis. The City Council adopted the plan on February 2, 2009. The plan consisted of the following: *Page 4 
I. Cuts/Reductions in Employee Salaries/Benefits
 FY '09 FY '10
 — Local 732, IAFF $585,000 $901,300
 — Local 404, IBPO $568,900 $707,900
 — Municipal Local 670 $178,400 $450,600
 — Municipal Pro Tec $107,900 $279,400
 — Non-Union Classified/Directors $132,500 $183,600
 II. Privatization of Outside Sewer Crew $500,000 $500,000
 III. Curbside Trash Fees $240,000 $960,000
 IV. White Goods Use of Contingency
 Account $95,000 $30,000
 TOTAL SAVINGS: $2,407,700 $4,012,800

Significant to the City's proposed budget cuts was the following:
1. Each group of employees is requested to contribute a proportionate share as to each groups total compensation budget.
2. The plan is subject to the states actual revenue cut and would restore employee compensation in a proportionate amount to the actual cut received by the City.
The City negotiated with all four City Unions for a period of five weeks. Multiple proposals were exchanged between the parties. In Late January 2009, with negotiations failing, the City decided it needed to take decisive action because the March 1, 2009 date was quickly approaching. In an attempt to avoid massive layoffs, the City drafted and the City Council passed two ordinances cutting salaries of all City employees by 5% and increasing health care so-shares for all City employees to 15% of the premium of either a family plan or individual plan.
The City continued to negotiate will all unions and on February 9, 2009 reached tentative agreements will municipal employees unions, Local 670 and Local 3853 *Page 5 
(Protech) as well as IBPO Local 404. The municipal employee unions, Local 670 and Local 3853 (Protech) agreements were ratified on Thursday, February 11, 2009 and IBPO Local 404 rejected the tentative agreement on Wednesday, February 10, 2009. (Defendant's Ex. K.) However, negotiations continued with the police and fire unions.
On February 6, 2009, all four Woonsocket Municipal Unions filed complaints in the Providence County Superior Court seeking injunctive relief and other relief. The controversy now only involves the Police and Fire Unions and the City. The police action has been held in abeyance by the parties pending the resolution of the Local 732 firefighter action.
 TRAVEL OF THE CASE
The Woonsocket Fire Department, Local 732 first requested a temporary restraining order preventing the City from reducing the pay of said Union members by 5% and to stop the imposition of a 15% co-payment on health insurance. The matter was conferenced by a justice of the superior court.
During conferences with said Judge, the City indicated since they could not reach agreement on the wage concessions they planned to lay off firefighters between 16 and 60 by sometime around February 23, 2009.
Local 732 then filed a temporary restraining order based on that City's plan regarding layoffs. The parties agreed that the layoff case would proceed before the matter involving pay cuts/co-pays.
On Friday, February 27, 2009, prior to closing arguments on the layoff issue, Local 732 agreed to dismiss or withdraw their request for Court action on the earlier City *Page 6 
plan to impose those cuts. The City stipulated that they would not impose the 5% pay cut or require a 15% health care co-payment.
On February 19, 2009, a retired superior court justice heard the request by the Woonsocket Firefighters-Local 732 for a temporary restraining order. Such request was opposed by the City.
At the conclusion of the hearing, the Court ordered that the Defendant/City was temporarily restrained from reducing the number of firefighters employed by the City below the number required and mandated by the Collective Bargaining Agreement (CBA) pending further order of the Court. The matter was assigned under Tuesday, the 24th of February. The restraining order was to be in effect until Monday, March 2, 2009. This Court on February 27, 2009 ordered that the temporary restraining order would remain in effect until further order of this Court.
 STANDARD OF REVIEW
An injunction is "an extraordinary remedy." Brown vs. Amaral,460 A.2d 7, 10 (R.I. 1983). "The primary factors a trial justice must consider in granting a preliminary injunction are a showing of irreparable harm to plaintiff, plaintiff's substantial likelihood of success on the merits, balancing the parties['] interests, and preserving the status quo."King v. Grand Chapter of R.I. Order of E. Star, 919 A.2d 991, 995 (R.I. 2007) (quoting Paolissi v. Fleming, 602 A.2d 551, 551 (R.I. 1992) (mem.)). "An application for [a preliminary injunction] is, of course, addressed to a trial justice's sound discretion. . . ." Coolbeth v.Berberian, 112 R.I. 558, 565, 3l3 A.2d 656, 659-60 (1974).
There are three issues then that a hearing judge must address when deciding whether to grant a preliminary injunction. First, the moving party must demonstrate that *Page 7 
he or she has a reasonable likelihood of succeeding on the merits of its claim at trial. The Fund for Community Progress v. United Way ofSoutheastern New England, 695 A.2d 517, 521 (R.I. 1997) (citations omitted). The moving party must only make a prima facie case and need not demonstrate a certainty of success. Id. In order to establish a prima facie case, the moving party must present some "amount of evidence that, if unrebutted, is sufficient to satisfy the burden of proof on a particular issue." Paramount Office Supply Company, Inc. v. D.A.McIsaac, Inc.., 524 A.2d 1099, 1102 (R.I. 1987) (quoting Nocera v.Lembo, 397 A.2d 524 (R.I. 1979)).
Next, the party seeking the preliminary injunction must show that it will suffer some irreparable harm which is imminent and for which no adequate legal remedy exists to restore the plaintiff to its rightful position. The Fund for Community Progress v. United Way of SoutheasternNew England, 695 A.2d at 521. The moving party must present some "statistical evidence or other data" before the hearing judge may find irreparable harm or likelihood of success on the merits. ParamountOffice Supply Company, Inc. v. D.A. McIsaac, Inc., 524 A.2d at 1102.
Only after finding a likelihood of success on the merits and an immediate injury should the Court balance the "equities of the case by examining the hardship to the moving party if the injunction is denied, the hardship to the opposing party if the injunction is granted and the public interest in denying or granting the requested relief." The Fundfor Community Progress v. United Way of Southeastern New England,695 A.2d at 521; In re State Employees' Unions, 587 A.2d 919, 925 (R.I. 1991). In this analysis, the hearing judge should recognize that:
 the office of a preliminary injunction is not ordinarily to achieve a final and formal determination of the rights of the *Page 8 
parties or of the merits of the controversy, but is merely to hold matters approximately in status quo, and in the meantime to prevent the doing of any acts whereby the rights in question may be irreparably injured to endangered. The Fund for Community Progress v. United Way of Southeastern New England, 695 A.2d at 521 (quoting Coolbeth v. Berberian, 313 A.2d 656, 659 (R.I. 1974)) (emphasis added).
The Court must deny a preliminary injunction when the moving party fails to meet the requirements set forth above by a preponderance of the evidence. Paramount Office Supply, Inc. v. D.A. McIsaac, Inc.,524 A.2d at 1102. For instance, if the moving party fails to establish a likelihood of success of the merits, the Court's analysis ends there. If the moving party does not present a prima facie case, there is no need to consider a balance of the equities. The analysis is complete and a preliminary injunction must be denied. The Fund for Community Progressv. United Way of Southeastern New England, 695 A.2d at 521;Paramount Office Supply Company, Inc. v. D.A. McIsaac, Inc., 525 A.2d at 1102.
Finally, a preliminary injunction, particularly a mandatory preliminary injunction, is an "extraordinary remedy." In re StateEmployees' Unions, 587 A.2d 919, 925 (R.I. 1991) (quoting Brown vs.Amaral, 460 A.2d 7, 10 (R.I. 1983)). Preliminary injunctions are generally disfavored when their effect grants the ultimate relief sought by the moving party. S.W. Industries, Inc. v. Aetna Casualty SuretyCompany, 646 F. Supp. 819, 823 (D.R.I. 1986) (citations omitted).
 EVIDENCE
Local 732 submitted the testimony of four witnesses at the hearing. Lt. Steven Reilly, a firefighter in Woonsocket for approximately 20 years and the President of Local 732 testified that the Union and the City had entered into a contract that had expired June *Page 9 
30, 2008. (Plaintiff's Ex.1.) The parties could not reach agreement on a new contract and were currently in Interest Arbitration. The parties had, however, entered into a continuation agreement (Plaintiff's Ex. 2.) pending the result of the arbitration. Lt. Reilly reviewed sections of the contract in effect particularly:
 § 3.6 — minimum manpower requirements
 § 3.7 — minimum platoon staffing
 § 3.8 — minimum day help staffing
He testified, in his opinion, that if 16-20 firefighters were laid off the Fire Department could not continue to function as it presently does due to forced overtime that would result in fatigue, sleep deprivation, increased injuries, increased stress and lack of training. Lt. Reilly testified that the Department was currently running 2 firefighters below their contracted and agreed upon 132 firefighters, but it was not now unsafe. He was not sure at what point it would be unsafe.
Chief Finley of the Woonsocket Fire Department testified that he has been Chief for l9 months and a member of the Woonsocket Fire Department for his entire 30 plus year career and had served as President of the Local 732 for about 6 years. He testified first, as an adverse witness for the Plaintiff, and then on behalf of the City. He stated unequivocally he could safely operate the Fire Department with the minimum 112 firefighters required under § 3-7, until June 30, 2009.[3]
He further testified that 2 of the staff positions in § 3-8 would have to be maintained as they need to be licensed and/or certified, but the other duties could be *Page 10 
assigned to other firefighters with the same rankings. The Chief expected some additional overtime as a result of the staffing due to vacations, sick leave, injury while on duty, etc.
Lt. Timothy Walsh is a 23 year veteran of the Woonsocket Fire Department (30 years in fire safety). Lt. Walsh works as an acute care nurse practitioner in a second job and has a B.A. in Fire Science and a Masters in of Public Health. He chairs the Woonsocket Fire Department Health Safety Commission which meets 3 or 4 times a year and advises the Chief on safety issues. He took a three day course sponsored by the NFPA re: Health and Safety. In his opinion, Lt. Walsh believes the reduction of the firefighters to 112 firefighters would be detrimental to the remaining firefighters due to stress, fatigue, overtime, sleep depravation. He also expressed concerns for officers over 50 and reduced training for younger firefighters. Lt. Walsh acknowledged there is no formal training schedule for the new firefighters and no set time table for certification. He believes the current economic situation could increase the number of fires. Lt. Walsh. discussed the National Firefighters Protection Association standards for firefighters particularly § 1500 and § 1710. (Defendant's Ex. D.) He acknowledged that no Town in Rhode Island complies with § 1710 re: staffing suggestions and that Woonsocket has never complied with it. He testified that the ISO rating of Woonsocket was a 2. (Defendant's Ex. E.) He introduced records that showed that there was 10,232 dispatch calls in 2008. (Exhibit 6.) 6,805 were rescue calls. Only 214 were fires — 46 fires in buildings. There were 314 calls for non/fire issues, and a total of 2,809 calls for general services including 1,651 for false alarms. He testified that the practice of the Woonsocket Fire Department was to send a fire apparatus with three firefighters on every rescue call *Page 11 
in addition to the rescue with two EMTS that would respond. He said there was no effective triage system in place to avoid duplication of rescue. He testified that the police no longer accompany firefighters for protection.
Prv. Michael Latille, a l7 year veteran of the Woonsocket Fire Department gave testimony explaining the potential impact the layoffs would have on the Department's vacation schedule and overtime requirements. There is already a built in shortage of up to 6 firefighters on each platoon if all vacation slots are filled. Over the next 4 months there could be as many as 699 vacation slots that could be used in the four platoons which would force a significant increase in overtime.
The Chief, was recalled by the City, and also testified about the ISO rating. The ISO is an insurance rating. His testimony was that the "2" rating was based on 1 — 10 with one being the best. There were 2 other communities with the "2" rating. No City or Town in Rhode Island had a "1" rating. He reiterated that the Fire Department can run safely on a temporary basis with 112 in platoons, 2 in day staff and himself on a temporary basis.
He testified that stress and fatigue were always an issue but were dependant on many factors. He noted a firefighter could on duty for 34 hours and be busy the entire time or be there 34 hours and have no calls. He also noted there is no prohibition or rules about firefighters having other jobs.
The City called Joel Mathews, Director of Planning and Development in Woonsocket, and the Executive Director of the Developmental Agency. Mr. Mathews testified about the financial status of the City, their rescue plan, contract negotiations and contingency plans. Consistent with the facts cited in the Decision, he testified that the *Page 12 
plan at this time was to layoff firefighters to temporarily reduce the number of Woonsocket firefighters from 132 (and the Chief) to 114 (and the Chief) for a potential l8 layoffs. However, there appears to be 7 vacancies presently so the layoff would probably be reduced to 11. (Plaintiff's Ex. 5.)
He testified that the City was on the edge of insolvency — in very dire financial condition. The City has an obligation under the Charter and Ordinance and State Law to take any and all steps to avoid deficit. He estimated with the payment of unemployment compensation (Woonsocket is self-insured) the projected savings would be approximately $13,000 per firefighter not counting additional overtime.
Robert Cenetti, a CPA and a Municipal Forensic Auditor, testified that the Woonsocket projected unreserved fund deficit for June 30, 2009 is $6,307,674.
 Jurisdiction
This Court has jurisdiction of this matter pursuant to G.L. 1956 § 8-2-13. Section 8-2-13 provides in pertinent part: "The superior court shall, except as otherwise provided by law, have exclusive original jurisdiction of suits and proceedings of an equitable character and of statutory proceedings following the course of equity. . . ." Our Supreme Court has recognized that "the Superior Court is a court of general equitable jurisdiction." La Petite Auberge, Inc. v. R.I. Comm'n forHuman Rights, 419 A.2d 274, 279 (R.I. 1980).
Local 732 argues that the issue of minimum manning in the CBA should be decided in interest arbitration under the Fire Fighters' Arbitration Act (FFAA), G.L. 1956 § 28-9.1-1, et seq. (Plaintiff's Memo. of Law in Support of Mot. for Preliminary Injunction.) See Lime Rock Fire Dist. v.Rhode Island State Labor Relations Bd., *Page 13 673 A.2d 51, 53-54 (R.I. 1996) (finding that employment status of unionized firefighters during contract negotiations was an unresolved issue that could have been submitted to arbitration pursuant to the FFAA);Town of Narragansett v. International Association of Fire Fighters,AFL-CIO, Local 1589, 119 R.I. 506, 380 A.2d 521 (1977) (establishing that when a minimum manpower provision is an unresolved issue in collective bargaining, it is arbitrable under the FFAA). The City counters that the issue of whether the CBA has been breached should be submitted to grievance arbitration pursuant to the CBA. See Romano v.Mancini, 412 A.2d 1131, 1132 (R.I. 1980) ("When parties have bargained for and agreed upon a mechanism for resolving contract disputes, they have no recourse but to pursue the remedy for which they contracted.") (citations omitted). The question of the proper arbitration forum for this dispute, be it interest arbitration pursuant to the FFAA or grievance arbitration pursuant to the CBA, is not the issue for the Court. at this time Local 732 is not asking this Court to reach the merits of its claim that the CBA is being violated, only to afford it equitable relief pending arbitration. This Court now considers Local 732's request for a preliminary injunction.
 Likelihood of Success on the Merits
The Court must first consider the Union's likelihood of success on the issue of whether the firefighter layoffs will violate any provision of the collective bargaining agreement (CBA) between the City and Local 732. Local 732 contends that the City's layoffs will violate the CBA. There are three specific sections of the CBA that Local 732 contends will be violated by layoffs. Specifically, Section 3.6 of the CBA provides a "Minimum Manpower Requirement."[4] The City does not plan to assign fewer *Page 14 
firefighters on fire apparatuses and rescues than the numbers required by the Minimum Manpower Requirement. Section 3.7 requires "Minimum Platoon Staffing."[5] With respect to such staffing, Chief Finlay testified that the City does not intend to operate with fewer than twenty-eight firefighters on four platoons. (See also Defendants' Objection to Plaintiffs' Mot. for Injunctive Relief 3.) Section 3.8 provides for "Minimum Day Help Staffing."[6] With respect to such day help staffing, Chief Finlay testified that these duties, except for two, could be safely transferred to other firefighters remaining after the proposed layoffs. Furthermore, the City does not intend to transfer the two job duties that require certification and could not be safely transferred. The Minimum Day Help Staffing provision does not state that firefighters currently serving on a platoon may *Page 15 
not simultaneously serve as day staff. It does not prohibit dual assignments.[7] Therefore, it does not appear that the City will be violating the language of the Minimum Manpower Requirement, the Minimum Platoon Staffing, and the Minimum Day Help Staffing provisions.
This Court must then examine whether Local 732 has a reasonable likelihood of success in proving that the City's proposed layoffs would violate the last sentence of § 3. 7 Minimum Platoon Staffing provision: "The Woonsocket Fire Department will operate with 134 employees plus the Fire Chief." (Plaintiff's Ex. 1.) See The Fund for CommunityProgress, 695 A.2d at 521. Section 3.7 Minimum Platoon Staffing's provision of 134 firefighters has been modified by a memorandum of agreement between the parties to 132. (See Plaintiff's Ex. 4.) In essence, Local 732 argues that this is departmental minimum staffing language. The City argues that the final sentence of the Minimum Platoon Staffing provision is not a departmental minimum manning provision and thus, the final sentence does not require that the Fire Department maintain 132 employees. Further, the City contends that the CBA does not contain a "no furloughs" provision, and the City maintains that it possesses the authority to lay off firefighters.
Moreover, the City argues that reading the CBA, absent specific language, as prohibiting layoffs would contradict the City Charter.See State of Rhode Island v. *Page 16 Rhode Island Alliance of Social Services Employees, Local 580,SEIU, 747 A.2d 465, 469 (R.I. 2000) (establishing that "the parties to a CBA have no legal authority to contravene state law by word or deed");see also Town of West Warwick v. Local 2045, Council 94, 714 A.2d 611,612 (order) (establishing that a town charter has the "force and effect of state law").
With respect to the City's authority to lay off firefighters, the City points to several sections of Woonsocket's City Charter. Chapter VII, article 3, section 4 provides:
 The approved allotments of appropriations and of numbers of employees may be revised by the finance department during the fiscal year and, if it shall ascertain that total available income for the year will be less than total appropriations, it shall recommend to the mayor the reconsideration and revision of the several work programs and allotments so as to prevent the making of expenditures in excess of income. (Defendant's Ex. G.)
Chapter VII, article 3, section 5 reads:
 Upon notification of the mayor that actual revenue receipts will not equal the original estimates upon which appropriations were based, the council shall make such reduction in appropriations as will prevent the occurrence of a deficit. Id.
The City contends that the Charter permits it to make necessary reductions in appropriations when it discovers that revenue will be lower than originally budgeted. Additionally, the City contends that several sections of the City Charter grant it the authority to control, reorganize, transfer, and abolish departments. Chapter IV, section 12 provides:
 All administration functions and services of the city government shall be allocated and assigned among and within the several departments under the control of the mayor except as otherwise provided by this chapter. (Defendant's Ex. G.) *Page 17 
Chapter IV, section 16 states:
 The head of any department appointed by the mayor may organize his department and make such assignment of duties as he may consider advisable unless otherwise provided by charter or ordinance. Id.
Chapter IV, section 18 states:
 The mayor shall have authority by executive order to combine or abolish any departments established by this charter. Id.[8]
Chapter IV, section 19 provides:
 The mayor may transfer by executive order any functions and duties from one department to another except such functions and duties as are assigned by this charter to a particular department. Id.
The Fire Department's "Rules and Regulations" provides that in matters relating to wages, hours, and rights, the CBA or the Personnel Ordinance controls. (Defendant's Ex. A.) Section 14.1 of the Personnel Ordinance states:
 [Vested in city.]
 The management of the city and direction of the working forces is vested exclusively in the city, including, but not limited to, the right to hire, suspend or demote, discipline or discharge for proper cause to, transfer or lay off because of lack of work, or other legitimate reasons to determine the type, kind and quality of service to be rendered to the community, to determine the location of the physical structures of any division or department thereof, to plan and schedule services and work programs, to determine the methods, procedures and means of providing such services, to determine what constitutes good and efficient city service, in accordance with the provisions of this ordinance. (Defendant's Ex. B) (emphasis added). *Page 18 
Additionally, the CBA grants the City authority to manage the Fire Department. Article II, section 2.1 of the CBA provides:
 2.1 Management Rights
 The City of Woonsocket shall retain the right to issue rules and regulations governing the internal conduct of the Fire Department as provided by law; provided, however that such rules and regulations do not conflict with the provisions of this Agreement and duly established past practices of the parties. (Plaintiff's Ex. 1.)
Article II, section 2.2 of the CBA provides:
 2.2 Rules and Regulations
 The Chief of the Fire Department, annually, after consultation with the officers of Local 732, shall review and update the rules and regulations of the Fire Department and cause a copy of the revised rules and regulations to be supplied to each member of the Fire Department.
 These rules and regulations, when approved by the City Council, shall be incorporated in the Personnel Ordinance. (Plaintiff's Ex. 1.)
This Court does not read the final sentence of the Minimum Platoon Staffing provision to prohibit layoffs. Had the parties desired to include a "no furlough" provision, they could have added one to the Agreement. This Court also finds it to be significant that the parties chose to use the word "will" in the sentence, "The Woonsocket Fire Department will operate with 134 employees plus the Fire Chief," rather than the word "shall" as it did in other sentences in the Minimum Manpower Requirement, Minimum Platoon Staffing, and Minimum Day Help Staffing provisions. (Plaintiff's Ex. 1.) The word "shall" has special significance in legal interpretation, traditionally signifying a mandatory condition. See Castelli v. Carcieri,961 A.2d 277, 284 (R.I. 2008) (establishing that "the use of the word `shall' contemplates something mandatory or the `imposition of a duty.'") (citation omitted); Carpenter v. Smith,79 R.I. 326, 334-35, *Page 19 89 A.2d 168, 172-73 (1952) ("The word `shall' usually connotes the imperative and contemplates the imposition of a duty, unless the particular context and plan require a contrary meaning.") Black's Law Dictionary defines the noun form of "will" as a "wish; desire; choice."Black's Law Dictionary 1628 (8th ed. 2004). The parties' deliberate decision to use the word "will" renders the sentence at issue directory rather than mandatory. Cf. Roadway Exp. Inc. v. Rhode IslandCommission for Human Rights, 416 A.2d 673, 674 (R.I. 1980) ("The intention of the Legislature controls our consideration of the mandatory or directory character of statutory provisions.") (citations omitted).
This one sentence at the end of § 3.7 is not consistent with the previous language nor is it necessary to complete that section. The sentence stands alone with no context to explain its inclusion. The language of § 3.7, at best, is ambiguous when read with the remaining sections of the contract on minimum staffing. It will not support the burden of proof that Local 732 has in this matter.
But even assuming arguendo the proposed temporary layoffs violated this section of the CBA or any other, not argued by the parties, this Court believes that the City would have the authority to layoff firefighters due to its current fiscal crisis pursuant to the Personnel Ordinance, which permits "lay off[s] because of lack of work, or other legitimate reasons." (Defendant's Ex. B.) The City has presented evidence before this Court of its dire financial circumstances. Local 732's rationale would obligate the City to pay firefighters to its total financial ruin.
Our Supreme Court has not had occasion to determine whether a fiscal crisis constitutes just cause for a layoff for an indefinite period of time. Castelli v. Carcieri, *Page 20 961 A.2d 277, 285 (R.I. 2008). It noted, however, that some of our sister states have decided that just cause does include fiscal reasons.Id.
Our Supreme Court cited various cases illustrating such fiscal grounds for layoffs. For example, in Castelli, our Supreme Court citedDebnam v. Town of Belmont, 447 N.E.2d 1237 (Mass. 1983), wherein a lack of money constituted "just cause" pursuant to a statute that protected firefighters against layoff "except for just cause." Id. at 1239. TheDebnam Court noted: "[A] municipality may temporarily separate a civil service employee from his or her employment when, in the judgment of its appropriate officials, anticipated revenues will be inadequate to pay the employee's salary as well as to meet other more pressing municipal needs." Id. at 1240. Significantly, in Castelli, our Supreme Court cited additional Massachusetts rulings for the proposition that just cause can be satisfied by a fiscal crisis: G M Employment Service, Inc. v.Commonwealth, 265 N.E.2d 476, 480 (Mass. 1970) ("The standard of `just cause,' . . . in the context of a statute regulating employment agencies, would require determination (among other matters) whether there existed . . . (2) grounds for discharge reasonably related, in the employer's honest judgment, to the needs of business."); Dooling v. FireComm'r of Malden, 34 N.E.2d 635, 638 (Mass. 1941) ("Obviously reasons of economy constitute just cause within the meaning of the [tenure statute]"); Comm'r of Health and Hospital of Boston v. Civil ServiceComm'n, 502 N.E.2d 956, 958-59 (Mass.App.Ct. 1987) ("The abolition of a position as part of an effort made in good faith to achieve economy . . . does not run afoul of civil service protections.").Castelli, 961 A.2d at 285 (citations omitted). Our Supreme Court further noted that a Utah court has similarly found that just cause allows "an employer to discharge an employee not only for misconduct or poor *Page 21 
performance but also for other legitimate economic reasons."Id. (quoting Uintah Basin Medical Center v. Hardy, 110 P.3d 168, 174
(Utah Ct.App. 2005)). On this same issue, the Supreme Court of Vermont noted that "[w]ithout exception, courts that have considered [whether economic circumstances constitute just cause to terminate an employees] have held that economic circumstances that necessitate employer layoffs constitute good cause for termination." Castelli, 961 A.2d at 285-86
(quoting Taylor v. National Life Insurance Co., 652 A.2d 466, 472 (Vt. 1993)).
This Court finds that the City's fiscal crisis, resulting from unexpectedly low revenue, qualifies as a "legitimate reason[]" pursuant to the City's Personnel Ordinance, empowering the City to make the proposed layoffs. (Defendant's Ex. B.) Such a "legitimate reason" was found to be the "unprecedented financial crisis" facing a city necessitating layoffs of city workers in DeLury v. City of NewYork, 371 N.Y.S.2d 964, 970 (N.Y.Sup.Ct. 1975). This Court also finds that even if it treats the CBA as valid and enforceable[9] and reads the final sentence of the Minimum Platoon Staffing provision, as *Page 22 
modified by the memorandum of agreement between the parties, to mandate a minimum firefighting force of 132, temporary layoffs of firefighters are not violative of this provision. The law distinguishes between abolishment or elimination of job positions and temporary layoffs. Our Supreme Court has established that the government abolishes a position when the job is entirely eliminated, not where an "employee's particular service in that job terminates." Casey v. Sundlun, 615 A.2d 481, 482
(R.I. 1992); see also Andersen v. Sundlun, 625 A.2d 213, 215-16 (R.I. 1993) (holding that the fixed term of years of an office created by statute continues to run even when the office is vacant). A layoff is temporary by definition and contemplates the return of the employee when the financial situation improves. See Howie v. Stackhouse,392 N.E.2d 1081, 1083 (Ohio Ct.App. 1977) ("A job abolishment contemplates a permanent elimination of a particular position while a layoff contemplates the retention of the position being temporarily unfilled because of either a lack of work or a lack of funds."). Temporary layoffs maintain the number of firefighter positions at 132. Thus, this Court finds that Local 732 does not have a reasonable likelihood of success in its argument that the layoffs are in violation of the final sentence of the Minimum Platoon Staffing provision of the CBA.
For several reasons stated above, this Court finds that Local 732 does not have a reasonable likelihood of success in its argument that the layoffs are in violation of the CBA. The City has already told the Court that it will not violate the Minimum Platoon Staffing, Minimum Manpower Requirement, the Minimum Day Help Staffing, or any other CBA provision. (See Plaintiff's Ex. 1.) This Court does not read the final sentence in § 3-7 the Minimum Platoon Staffing provision as a departmental minimum staffing requirement. See id. Even if this Court did read that sentence as a mandate, this Court *Page 23 
finds that the City has the authority to make the proposed layoffs in a fiscal crisis, and temporary layoffs, unlike abolished positions, do not reduce the number of firefighters below 132. Based on this Court's decision that Local 732 does not have a reasonable likelihood of success in its argument that the layoffs violate the CBA, this Court need go no further. See In re State Employees' Unions, 587 A.2d at 925. However, as the thrust of Local 732's argument was that irreparable harm would accompany these layoffs, this Court will address this argument for inclusiveness.
 Irreparable Harm
In addition to demonstrating a reasonable likelihood of success on the merits, the moving party must show irreparable harm. "[T]he principal prerequisite to obtaining injunctive relief is the moving party's ability to prove that it is being threatened with some immediate irreparable injury for which no adequate remedy at law lies." In reState Employees' Unions, 587 A.2d 919, 925 (R.I. 1991) (citingBrown v. Amaral, 460 A.2d 7, 10 (R.I. 1983) (further citation omitted)). The irreparable injury must either be presently threatened or imminent.Id. "Injuries which are prospective in nature, or which might not occur, cannot form the basis for injunctive relief." Id. (citing R.I. Turnpike Bridge Authority v. Cohen, 433 A.2d 179, 182 (R.I. 1981)).
With respect to such injury, the firefighters of Local 732 contend that the health and safety of its remaining members will suffer if the City lays off firefighters. Lieutenant Steven Reilly and Timothy Walsh testified that the remaining firefighters would experience increased stress levels, fatigue, sleep deprivation and suffer more injuries. *Page 24 
This Court notes that the Department, under agreement has a full staffing of up to 132 plus a Chief. The Department is below that now but running safely. The Woonsocket Fire Department receives over 10,000 calls a year, with over 70% of those calls being rescue calls. (Plaintiff's Ex. 6.) It is the Fire Department's practice to send a fire apparatus (truck, ladder) with three additional firefighters to each call. There is no discretion used in said response. In fact, the response is not mentioned anywhere in the contract.
Furthermore, the Woonsocket Fire Department has an ISO-rating of 2, the highest any fire department has in the state. (Defendant's Ex. E.) Only three other municipalities have that same rating. The other departments have lower ratings.
As for the contract, the Court notes an absence of the following. There are no minimum training standards in the contract. There are no physical requirements in the contract. There are no age references in the contract. There is no time table in the contract for certification. There is no restriction of limitations on outside employment in the contract. (See Plaintiff's Ex. 1.)
At the same time, there is no state law that mandates and of the following: the number of firefighters on fire apparatuses; the number of firefighters in fire stations; the number of firefighters in a platoon or shift; the number of firefighters on day staff; the number of fire stations or houses per population; or the number of fire apparatuses per population.
There clearly will be increased "forced overtime" if the layoffs take place. However, this Court has before it no documentation of reliable evidence or any evidence that is not opinion evidence by interested parties regarding stress levels, fatigue, injury *Page 25 
levels, age related issues, or reduction of training. The evidence submitted is speculative. Furthermore, there is no evidence presented that the temporary, limited layoffs would significantly increase these already existing factors for the firefighters. That opinion is contradicted by the present Chief, a firefighter with over thirty years experience, including six years as Local 732 President. As he noted, these factors are dependent on the specific circumstances.
It is well-settled that speculative injury is insufficient to demonstrate a likelihood of irreparable injury. Charles A. Wright et al., Federal Practice Procedure, § 2948.1 at 153 (2d Ed. 1995). At a preliminary injunction hearing in Paramount Office Supply Co., Inc. v.D.A. MacIssac, Inc., 524 A.2d 1099 (R.I. 1987), a company seeking a preliminary injunction against its former employee and his new employer, failed to present any witnesses or affidavits. Id. at 1100. Our Supreme Court found that "no reports, statistical evidence, or other data were offered in evidence before the trial justice by [the movant] to justify a finding of irreparable harm." Id. at 1102. Here, too, Local 732 did not present any statistical data demonstrating how the proposed layoffs would impact the health and safety of the fire department.
Like Local 732, a firefighter union in Pontiac Fire Fighters UnionLocal 376 v. City of Pontiac, 753 N.W.2d 595 (Mich. 2008), sought a preliminary injunction, arguing that the city layoffs of twenty-eight firefighters to meet budget shortfalls would negatively impact the health and safety of the remaining firefighters. Id. at 597, 601. This Court finds persuasive the reasoning in Pontiac Fire Fighters: that the negative impact on remaining firefighters is too speculative to serve as the potential irreparable harm necessary to grant an injunction persuasive. Noted the Pontiac Fire Fighters Court: *Page 26 
"Neither [the union] nor the circuit court detailed how the remaining firefighters faced real and imminent danger from the layoffs rather than future, speculative harm." Id. at 601 (emphasis in original). Similarly, in International Association of Firefighters Local #23 v. City of EastSt. Louis, 565 N.E.2d 264 (Ill.Ct.App. 1990), the union argued that remaining firefighters, after layoffs, "would suffer irreparable harm in that they would be forced to work longer hours or additional shifts, the Fire Department would be undermanned, and the duties of the remaining firefighters would be rendered more hazardous." Id. at 267. The Appellate Court of Illinois found "the other damages alleged by Union, danger of fatigue, lack of manpower, and the need to work longer hours for which the firefighters would be paid, to be speculative and not the type which threaten the integrity of the arbitral process."Id. at 268. Like the Michigan and Illinois Courts, this Court finds that the potential negative consequences for the firefighters remaining after layoffs too speculative to serve as the potential irreparable harm warranting a preliminary injunction.
The Union has relied on two cases that the Court finds distinguishable: Ardito v. City of Providence, 263 F.Supp.2d 358 (D.R.I. 2003) and Crocker v. Pielch, et al., No. 00-1771, May 9, 2002, Silverstein, J., to support its argument that laid off firefighters will be irreparably harmed. In Ardito, police officer applicants sought a preliminary injunction to enjoin city officials from excluding them from the police academy. Ardito, 263 F.Supp.2d at 361. The applicants, without the police academy training, could not be hired as police officers, and no guarantee existed that the applicants would be accepted in a future police academy class. Id. at 372. In granting the injunction, the District Court in Ardito noted that "it would be impossible to restore their lost seniority rights or to attach *Page 27 
a dollar value to that loss." Id. Here, however, any laid off firefighters have already been hired and retain the right to return to their positions after four months. Their future employment does not hinge on the loss of training like the police officer applicants inArdito. The laid off firefighters will not lose seniority because new firefighters will not be hired in the next four months. If the City's financial situation improves, it will begin reemploying those firefighters who have been laid off in accordance with current seniority rights, and those firefighters will resume their training.
In Crocker, a police officer sought a preliminary injunction to enjoin a town from mandating his retirement. Crocker, No. 00-1771 at 1-3. TheCrocker Court found that the officer would suffer irreparable harm without an injunction because the CBA obligated the mayor to fill the officer's position of Captain within sixty days after the vacancy.Id. at 13. In the case at bar, the laid off firefighters will not be permanently replaced by new firefighters. These proposed layoffs cover a four month period, and the City will reemploy those laid off. Those who are laid off will continue the department's largely informal training upon reemployment.
Local 732 finally argues that those firefighters laid off will be financially harmed. At closing arguments, Local 732 argued firefighters could potentially lose houses or be unable to send their children to private school. While this Court is sympathetic to the potential financial hardships these layoffs will have on firefighters and their families, the law is clear. Financial hardship alone does not rise to the level of irreparable harm under the law. See In re State Employees'Union, 587 A.2d at 926 ("[I]t must be borne in mind that a complaint relating to lost income is, in its essence, a claim for money damages. It is axiomatic in equity law that a claim for monetary damages will ordinarily not invite *Page 28 
injunctive relief, as there is an adequate remedy at law.") Again, the Court need go no further in the review of this matter, but for the purposes of discussion will review the equities involved.
 Balance of Equities
Had this Court found a likelihood of success on the merits and the potential for irreparable harm, it would be required to balance the equities between the parties while being mindful of the public interest.In re State Employees' Unions, 587 A.2d at 927 (citation omitted). Chapter VII, article 3, sections 4-5 of the City Charter, obligate the Woonsocket to reduce expenditures to avoid a deficit. Woonsocket has a serious cash flow problem and faces insolvency. The City's financial problems have damaged its bond rating[10] that could limit its ability to raise funds to construct two middle schools. . The City developed a comprehensive plan asking its employees to accept lower wages and benefits. It has attempted to spread the harm fairly across its various employees. The proposals by the City would cut salaries and raise the cost of benefits for all firefighters but would have avoided any layoffs. It reached settlements with its municipal union and nonunion employees. The City was unable to reach an agreement with the public safety unions. Though the layoff of firefighters will not save enough money to balance the City's budget, it does reduce the gap between revenue and appropriations. The City of Woonsocket can be safely served by the remaining firefighters for the period of time in question. Our Supreme Court's adopted analysis in In re State Employees' Unions
applies here: "The budget must be balanced. The cash flow crisis must be stemmed. Imposition of the injunction which the unions seek would only augment the current economic and fiscal exigency." In re StateEmployees' Unions, 587 A.2d at 927. *Page 29 
This Court is sympathetic with the plight of the firefighters but "[t]he astronomical disclocations and deprivations which wage earners in private industry have been enduring are now unavoidably encroaching upon the public employees. Would that they could, but . . . the courts can [not] guarantee [public] employees safe harbor or refuge from the pernicious consequences of economic decline." Id.
There are probably no public employees that are more respected by the public than our firefighters. A firefighter, in full gear, heading into danger is an iconic image in our Nation's consciousness, especially since 9/ll. Firefighters everyday are there to help the public. But in these difficult economic times, no employee, public or private, can expect immunity from the difficult decisions that must be made for our communities to survive this economic crisis and continue to provide services to those in need. This Court finds that the balance of equities also weighs in favor of denying Local 732's motion for a preliminary injunction.
 Conclusion
For the foregoing reasons, this Court denies Local 732's motion for a preliminary injunction. The City of Woonsocket may temporarily lay off firefighters, as long as the total number of firefighters does not go below 114 (exclusive of the Fire Chief). The order is in effect until June 30, 2009. This Court will retain jurisdiction.
[1] This information was provided by the City originally by way of affidavit in its objection to the Plaintiff's request for preliminary injunction. The City corroborated this evidence by way of testimony at the hearing. The Plaintiff is not contesting those facts.
[2] The Court was informed, after the conclusion of the hearing, on Tuesday, March 3, 2009 that the City was able to secure a tax anticipation note. The City provided an affidavit to the Court on Wednesday, March 3, 2009 by the Finance Director. According to the Director's Affidavit a commitment from Citizens Bank has been received but all terms are not finalized. The tax anticipation note is a loan which must be repaid by July 31, 2009. It will assist with cash flow but not reduce the deficit. (Defendant's Ex. J.)
[3] On Friday, February 27, 2009, at the conclusion of the evidence, the Chief announced his retirement effective March 30, 2009. The City filed a motion on March 3, 2009 to re-open the hearing to present testimony from the senior Deputy Fire Chief. After conference with counsel and review of the Collective Bargaining Agreement and Charter and Rules and Regulations, the parties agreed that there is no language that controls who the Mayor/Public Safety Commissioner must appoint as Interim Chief when Chief Finley retires. Local 732 did press it's motions.
[4] Section 3.6 of the CBA provides:
 3.6 Minimum Manpower Requirement
 No fire apparatus, except Rescue vehicles, shall be operated at any time with less than three (3) fire fighters on the vehicle.
 No Rescue vehicle shall be operated at any time with less than two (2) fire fighters on the vehicle who are E.M.T.C. qualified. Any third fire fighter who volunteers for Rescue must be E.M.T. qualified.
 (Plaintiff's Ex. 1.)
[5] Section 3.7 of the CBA provides:
 3.7 Minimum Platoon Staffing
 The Woonsocket Fire Department shall be run on a four (4) platoon system. Each of the four (4) platoons shall be assigned thirty-one (31) Fire Fighters, consisting of the following: One (1) Deputy Chief, two (2) Captains, five (5) Lieutenants, two (2) Acting Captains or Lieutenants on Rescues, twenty (20) Privates and two (2) Dispatchers. All of the four (4) Platoons shall have a minimum of twenty-eight (28) Fire Fighters working on each Platoon.
 The Woonsocket Fire Department will operate with 134 employees plus the Fire Chief. (Plaintiff's Ex. 1.)
By a memorandum of agreement, the City and Local 732 have agreed that the fire department will operate with 132 employees and a Fire Chief.
[6] Section 3.8 of the CBA provides in pertinent part:
 3.8 Minimum Day Help Staffing
 (a) Day help within the Woonsocket Fire Department shall consist of one (1) Fire Alarm Superintended, one (1) Captain assigned as Fire Training Officer, one (1) Captain assigned as Fire Marshal, one (1) E.M.S. Coordinator, one (1) Mechanic, one (1) Private assigned as Fire Alarm Officer, * two (2) Lieutenant's assigned as Assistant Fire Marshals, one (1) Private or civilian assigned as Fire Clerk, and ** one (1) Haz Mat Specialist. (Plaintiff's Ex. 1.)
[7] The Fire Department's Rules and Regulations grant the Fire Chief broad authority to manage the Fire Department. The Rules and Regulations provide that the Fire Chief "shall assign all subordinates to their respective posts, shifts, details, duties, and shall be responsible for their efficiency, discipline, and good conduct; and for the care and custody of all property used by the department." Further, the Fire Chief has "precedence and entire control of all divisions and their officers and members when engaged in the service of the City." The Fire Chief has "the power to direct and assign all subordinates, companies, and appurtenances belonging to the department and shall direct such measures as he/she shall deem proper and necessary for the control and extinguishments of fires." The Rules and Regulations provide, "During emergency situations, [the Fire Chief] shall have the authority to temporarily transfer members of the department, from one station to another, when it is in the best interests of the department and/or the City of Woonsocket." Also, the Fire Chief "shall have jurisdiction for all necessary decisions that need to be made in emergent and non-emergent situations for the betterment of all involved." (Defendant's Ex. A at 9.)
[8] See Chapter X, article 4, section 2 of Woonsocket Charter (establishing the fire department). (Defendant's Ex. G.)
[9] The City also argues that the CBA is void and unenforceable because it was not been ratified or approved by the City Council.See Providence City Council v. Cianci, 650 A.2d 499 (R.I. 1994) (finding the CBA agreed upon by the mayor and a union invalid and unenforceable because it was not ratified by the city council pursuant to a city ordinance); Providence Teachers Union v. Providence School Bd.,689 A.2d 384 (R.I. 1996) (holding that CBA entered into by school board and union was invalid and unenforceable absent city council ratification and vacating arbitration award construing unenforceable CBA). Chapter VIII, section 10 of the City Charter provides:
 All purchases or contracts in the nature of lease purchase shall not be awarded until approved by resolution of the city council. All purchases or contracts in excess of one hundred thousand dollars ($100,000.00) or purchases or contracts scheduled to be performed beyond one (1) year shall not be awarded until approved by resolution of the city council. (Election of 11-16-83; election of 11-3-87) (Defendant's Ex. G.)
This Court finds that the CBA is a validly formed and is a fully executed contract, and the City is estopped from denying its validity for purposes of this hearing. See Alix v. Alix, 497 A.2d 18, 21
(establishing that "when a necessary element of a contract is lacking as a result of one contracting party's failure to act, and that party has reaped those benefits to which he or she was entitled under the contract, he or she cannot thereafter raise the issue of the validity of the contract in order to avoid fulfilling his or her own obligations under the contract.") (citation omitted). The parties are free to argue this issue in litigation in the future.
[10] The City's bond rating of BBB+ is two steps above junk bond status. (Defendant's Ex. L.)